Eduardo Arce GONZALEZ,
Plaintiff–Appellee,

v.

Rosa Teresa GUTIERREZ,
Defendant–Appellant.

Eduardo Arce Gonzalez,
Plaintiff–Appellant,

v.

Rosa Teresa Gutierrez, Defendant–
Appellee.

Nos. 02–55079, 02–55120.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 7, 2002.

Filed Nov. 20, 2002.

944

Rose M. Kasusky, Casa Cornelia Law Center, Peter H. Benzian and Tulin D. Acikalin, Latham & Watkins, San Diego, CA, for the appellant-cross-appellee.

Victor Mordey, Chula Vista, CA, for the appellee-cross-appellant.

Before: REINHARDT, TROTT and TASHIMA, Circuit Judges.

## OPINION

REINHARDT, Circuit Judge.

The advent of private international law has presented difficult problems of interpretation for federal courts. Here, in order to determine a question that would be, but for the crossing of international borders, a wholly domestic matter for another sovereign nation, we must elicit the meaning of treaty provisions agreed upon by several countries with both common law and civil law traditions.

In this case of first impression, we determine whether a *ne exeat* clause con-

tained in a foreign custody agreement constitutes "rights of custody" under the Hague Convention on the Civil Aspects of International Child Abduction. We hold that it does not, and reverse the judgment of the district court. In doing so, we follow the approach taken by the Second Circuit in *Croll v. Croll*, 229 F.3d 133 (2d Cir.2000), the only other Circuit to have addressed this question.

## I. BACKGROUND

A. *The Hague Convention on the Civil Aspects of International Child Abduction*

The Hague Convention on the Civil Aspects of International Child Abduction is an international treaty among the United States and fifty other countries.[1] *Hague Convention on the Civil Aspects of International Child Abduction, opened for signature* October 25, 1980, T.I.A.S. 11,670, *reprinted in* 51 Fed.Reg. 10,494 (March 26, 1986). Despite the forceful connotation of words like "abduction" that are employed in the treaty, the Convention's drafters were concerned primarily with securing international cooperation regarding the return of children wrongfully taken by a parent from one country to another, often in the hope of obtaining a more favorable custody decision in the second country. *Mozes v. Mozes*, 239 F.3d 1067, 1069 (9th Cir.2001). The Convention only applies when both countries are parties to it.[2] *Convention*, art. 35. Under the Convention each country must designate a Central Authority responsible for oversee-

---

1. For the sake of brevity, we refer to the treaty throughout as the Convention or the Hague Convention.

2. The Convention was entered into force between Mexico and the United States on October 1, 1991. *See* <http://www.hcch.net/e/status/abdshte.html> Accessions are made by countries, like Mexico, that are not mem-

bers of the Hague Conference on Private International Law. An accession is effective only between the acceding country and those contracting states that have accepted the accession. *Convention*, art. 38. Although Mexico is now a member of the Hague Convention, accession rather than ratification was required because on the date that the Conven-

ing the implementation of a country's obligations.[3] 42 U.S.C. § 11606(a). Within the state of California, the California Attorney General's Office acts as the Central Authority.[4] Under U.S. law, the Convention is implemented by the International Child Abduction Remedies Act ("ICARA"). 42 U.S.C. §§ 11601–11610.

A Convention proceeding is a civil action brought in the country to which the child was wrongfully removed. Wrongful removal means that a parent has taken a child out of a country in violation of the other parent's custody rights. ICARA actions may be brought in state or federal court. The conclusion that a child has been wrongfully removed under the Convention obligates a court to order him returned to the country from which he was taken. A parent who opposes the return of his child may, however, raise four affirmative defenses. *Hague Convention*, art. 12, 13, 30; 42 U.S.C. § 11603(e)(2). Unless these defenses are raised successfully, the court must order a wrongfully-removed child returned; a judicial proceeding under the Convention is not meant, however, to inquire into the merits of any custody dispute underlying the petition for return. *Convention*, art. 19; *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir.1999). Of paramount importance to the case before us, the Convention provides the remedy of return *only* for a parent who has "rights of custody." *Convention*, art. 12.[5] A parent possessing only access rights is not entitled to that remedy. Instead, a parent with access rights is permitted to submit an "application to make arrangements for organizing or securing the effective exercise of [such] rights" to the Central Authority of the country to which the child has been removed. *Convention*, art. 21.

### B. Factual Background

Rosa Teresa Gutierrez and Eduardo Arce Gonzalez, both Mexican citizens, were

---

tion was opened for signature, it was a nonmember. *See* Carol S. Bruch, *The Central Authority's Role Under the Hague Child Abduction Convention: A Friend in Deed*, 28 Family L.Q. 35, 36 n. 3 (1994). The distinction between accession and ratification is that only nations that have ratified the Convention can be considered signatories under Article 37. Accession, by contrast, binds a country only with respect to other nations that accept its particular accession under Article 38. *See* Lynda R. Herring, *Taking Away the Pawns: International Parental Abduction & the Hague Convention*, 20 N.C.J. Int'l L. & Comm. Reg. 137, 138 n. 8 (1994).

**3.** Article 7 provides that "Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention." *Convention*, art. 7.

**4.** Article 6 provides that a Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities. Federal States, States with more than one system of law or States having autonomous territorial organizations shall be free to appoint more than one Central Authority and to specify the territorial extent of their powers: Where a State has appointed more than one Central Authority, it shall designate the Central Authority to which applications may be addressed for transmission to the appropriate Central Authority within that State.
*Convention*, art. 6.

**5.** Article 12 provides, in relevant part, that: Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

married in Guadalajara, Mexico on December 18, 1992. Arce is a self-employed finance broker; Gutierrez, a stay-at-home mother. Gutierrez and Arce had two children from their marriage: Maria Teresa Arce Gutierrez, born in 1993, and Eduardo Antonio Arce Gutierrez, born in 1997. All members of the family lived in Mexico until February of 2001.

The unhappy marriage that resulted from their union inflicted its miseries on the entire family.[6] Arce physically and verbally abused Gutierrez, sometimes in front of Maria and Eduardo. At the evidentiary hearing conducted by the district court, Gutierrez testified that "[d]uring my whole marriage it was a very bad relationship. I suffered abuse physically, emotional, sexual, economical [sic], which continued even after we separated and even after the divorce." Susana Galarza, Gutierrez's sister, testified that during a period of four years in which she and the Arce Gutierrez family shared a house in Mexico, Arce would frequently come home drunk and behave in an aggressive manner toward the family. The couple finally separated in November 1998.[7] During the separation and after the couple's eventual divorce, the children always lived with Gutierrez.

Gutierrez's troubles were not over, however. Arce's physical and verbal abuse continued. In July 1999, Gutierrez approached the Human Rights Office in Mexico, but was told that the Office only assisted people who had been mistreated by the government. One day in January 2000, Arce physically assaulted Gutierrez, by hitting her, throwing her to the ground, and yelling profanities at her, all in the presence of Eduardo, then almost three years old. After this incident, Gutierrez, at the advice of her attorney, sought the help of the local police, who insisted that she first obtain a medical report documenting her injuries. Gutierrez and her attorney went to the Red Cross, only to be turned away because Gutierrez was not bleeding and did not yet exhibit visible bruises. A few days later, when her bruises did appear, Gutierrez was refused a second time by the Red Cross, which declined to prepare a report for her because she lacked proof that it was Arce who was responsible.

Shortly before this incident, Gutierrez had filed for a fault-based divorce, based on Arce's spousal abuse. Eventually, however, Arce and Gutierrez filed a mutual consent divorce petition. Gutierrez testified that she agreed to the mutual consent divorce because it offered "immediate protection," and that she was told a fault-based divorce might have taken three to five years to resolve. In August 2000, a Jalisco family court granted the divorce. Because the appeal taken here focuses on the nature of Arce's parental rights, we quote at length from the official translation of their divorce agreement:

> I. During the divorce proceedings and once the divorce settlement has been reached, our minor children, MARIA TERESA AND EDUARDO ANTONIO, whose last names are ARCE GUTIERREZ will remain under the custody and care of their Mother ROSA TERESA DEL RAYO GUTIERREZ, at the property located on Francia Street number 1635–b, Colonia Moderna, in this City of Guadalajara, Jalisco.

---

6. "All happy families resemble one another; every unhappy family is unhappy in its own way." Leo Tolstoy, *Anna Karenina* pt. 1, ch. 1 (C. Garnett, trans., International Collectors Library 1965).

7. Arce testified that the couple separated in December 1999, but this discrepancy is of no import.

The father, EDUARDO ARCE GON-ZALEZ will be able to visit his minor children on Monday, Wednesday and Friday from 14:00 to 17:00 hours every week. The father will also be able to take the children with him for the weekend every other week, and take them on vacation 2 weeks per year, as long as this does not interfere with the health and education of the minors.

EDUARDO ARCE GONZALEZ must grant full authorization according to law, until they reach adult age, on every occasion that his minor children MARIA TERESA AND EDUARDO ANTONIO whose last names are ARCE GONZALEZ, seek to leave the country accompanied by their mother MARIA TERESA RAYO GUTIERREZ ACEVES or any other person.

The third and final paragraph comprises the *"ne exeat"* clause critical to our decision in this case.[8] The parties agree that the paragraph is to be construed as prohibiting Gutierrez from taking the children out of the country without Arce's permission.

The divorce did not abate Arce's physical or emotional abuse. Gutierrez testified that, in one instance, Arce shoved her, and in another, left a note containing profanity at her home. Her continued victimization may have led to the events that followed. On February 28, 2001, Gutierrez informed Arce that she planned to take the children on a one week vacation in Mexico. On March 8, the day the children were to

return, Arce was unable to locate them, and eventually determined that Gutierrez had taken the children to the United States, to the home of Ms. Galarza, Gutierrez's sister, and now a permanent U.S. resident living in San Diego.[9]

## C. *Procedural History*

On October 18, 2001, the District Attorney's Office of San Diego County, acting on behalf of the California Attorney General's Office,[10] filed a Petition for the Return of Children to Mexico in San Diego Superior Court. The petition sought the return of Maria and Eduardo to Mexico under the International Child Abduction Remedies Act. 42 U.S.C. §§ 11601–11610. On October 25, Gutierrez removed the action to federal district court.

After conducting an evidentiary hearing, the district court issued its Findings of Fact and Conclusions of Law on December 6, 2001. The district court concluded that the children had been wrongfully removed in violation of Arce's custody rights under the Convention and that Gutierrez had failed to establish any affirmative defenses that would prevent their return. Accordingly, the district court ordered that the children be returned to Mexico. On December 31, acknowledging that the exact nature of Arce's rights posed "a difficult legal question that neither the United States Supreme Court nor the Ninth Circuit has ruled upon," the district court

**8.** A *ne exeat* clause is defined as a "writ which forbids the person to whom it is addressed to leave the country, the state, or the jurisdiction of the court." BLACK'S LAW DICTIONARY 1031 (6th ed.1990).

**9.** Upon arriving in the United States, Gutierrez applied for asylum for herself, Maria, and Eduardo on the basis of her status as a victim of domestic violence. On June 25, 2002, the

Immigration Judge granted Gutierrez's application for asylum and for restriction on removal for herself and the children. The INS appealed the decision on July 8, 2002. The appeal to the BIA remains pending.

**10.** The various county district attorneys assist the Attorney General in discharging his duties under the Hague Convention.

granted Gutierrez's request for a stay. Gutierrez appealed.[11]

## II. DISCUSSION

In a case brought under the Convention, we review the district court's finding of fact for clear error and its conclusions of law regarding the Convention *de novo*. *Shalit*, 182 F.3d at 1127. Although in interpreting a treaty we "begin with the text," we may "look beyond the written words" to other factors for interpretive guidance. *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534–35, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991)(internal quotations omitted). Appropriate sources to consult include the purposes of the treaty, its drafting history, and its post-ratification understanding. *See El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 167–76, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). Gutierrez argues that the existence of a *ne exeat* clause in the divorce agreement does not transform Arce's visitation rights into custodial rights under the Convention. We agree. Here, while the post-ratification history is in conflict, the purpose, text, and drafting history of the Convention compel us to conclude that a *ne exeat* clause does not provide "rights of custody" to a parent who otherwise possesses only access rights.

### A. The Ne Exeat Clause Does Not Confer Rights of Custody Upon a Parent with Access Rights

The "key operative concept" of the Convention is that of "wrongful" removal. *Shalit*, F.3d at 1070. Under the terms of the Convention, a child's removal is wrongful only if one of the parent's custody rights are breached. Article 3 provides that a removal is wrongful if:

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Convention*, art. 3. Since no wrongful removal exists without the possession of custodial rights by the parent seeking the child's return, the central question we must decide is whether Arce possesses custodial rights as understood under the Convention.[12]

### 1. Text

Our inquiry begins with the text. *Tseng*, 525 U.S. at 167, 119 S.Ct. 662. The Convention creates an explicit distinction between rights of custody and rights of

---

11. Because we reverse on the question of Arce's rights under the Convention, we do not reach the other issues raised on appeal by Gutierrez, namely the district court's denial of her affirmative defenses under articles 13(b) and 20. Article 13(b) provides that a court is "not bound to order the return of the child" if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Convention*, art. 13(b). Article 20 provides that the "return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the request-

ed States relating to the protection of human rights and fundamental freedoms." *Convention*, art. 20.

12. On appeal, the parties dispute whether Arce possesses rights of custody. Neither the district court nor the parties addressed whether Arce actually exercised those rights under article 3(b). Because we reverse the decision of the district court, we need not and do not reach this question. That Mexico is the children's country of "habitual residence" is undisputed.

access. Specifically, article 5 provides that:

For the purposes of this Convention—
a. 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;
b. 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

*Convention*, art. 5. Only a parent with rights of custody may petition a court for an order of return as provided in article 12, and as implemented in American law by ICARA. *Convention*, art. 12; 42 U.S.C. § 11603(b). Although an order of return is not available to him, a parent who holds only access or visitation rights does not lack a remedy. He may, under article 21, "submit an application to make arrangements for organizing or securing the effective exercise of rights of access" to the Central Authority of the State to which the child has been taken.[13]

▇▇ Here, Arce argues that he has custodial rights under the Convention because the *ne exeat* clause of the divorce agreement constitutes "the right to determine [his children's] place of residence." We reject the argument. The "right"

granted under a *ne exeat* clause is, at most, a veto power. *Croll v. Croll*, 229 F.3d 133, 140 (2d Cir.2000). A parent with custodial rights has the *affirmative* right to determine the country, city, and precise location where the child will live. This is one of the primary rights of a custodial parent.[14] By contrast, a *ne exeat* clause serves only to allow a parent with access rights to impose a limitation on the custodial parent's right to expatriate his child.

At most, Arce could, under the terms of his divorce agreement with Gutierrez, refuse permission for his children to leave Mexico. He cannot, however, direct with any specificity where the children will reside either within the borders of Mexico or within any other country. This, in our view, hardly amounts to a right of custody, in the plainest sense of the term. *See Article 31.1., Vienna Convention on the Law of Treaties*, 1155 U.N.T.S. 331, T.S. No. 58 (1980), 8 I.L.M. 697 (1969)("A treaty shall be interpreted in good faith in accordance with the *ordinary meaning* to be given to the terms of the treaty in their context and in the light of its object and purpose.")(emphasis added);[15] RANDOM HOUSE DICTIONARY 393 (1979)(defining "determine" as "to settle or decide . . . by an authoritative or conclusive deci-

---

**13.** Whether a *judicial* remedy is available to parents possessing only access rights is an unresolved issue in American courts. *Compare* 42 U.S.C. § 11603(b)(suggesting that non-custodial parent may petition court to secure access rights) *with Fernandez v. Yeager*, 121 F.Supp.2d 1118, 1124–25 (W.D.Mich.2000)(holding that federal courts lack jurisdiction to enforce rights of access under Convention) *and Bromley v. Bromley*, 30 F.Supp.2d 857, 860 (E.D.Pa.1998)(holding that "plain language of Convention does not provide federal courts with jurisdiction over access rights.").

**14.** We note that, for example, family law decisions of California state courts affirm the

proposition that custodial parents typically hold the sole right to determine a child's place of residence. *See, e.g., In re Marriage of Burgess*, 13 Cal.4th 25, 35, 51 Cal.Rptr.2d 444, 913 P.2d 473 (1996)(noting presumptive right of custodial parent to change residence of children); *In re Marriage of Condon*, 62 Cal.App.4th 533, 73 Cal.Rptr.2d 33 (1998)(noting that *Burgess* decision followed "national trend").

**15.** While the United States is not a signatory to the Vienna Convention, it is the policy of the United States to apply articles 31 and 32 as customary international law. *See R. Griggs Group Ltd. v. Filanto Spa*, 920 F.Supp. 1100, 1105 n. 7 (D.Nev.1996).

sion"). By taking the children to the United States, Gutierrez has undoubtedly violated the terms of her divorce agreement, but addressing that violation is not within our purview. We conclude that under the text of the Convention the *ne exeat* clause is merely a condition designed to protect Arce's access rights, and no more.

### 2. *Purpose*

■ This understanding of custodial rights is also consistent with the purposes of the Convention. The primary purpose of the Convention, as stated in its preamble, is the desire to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Convention*, preamble. Even within the preamble, the Convention recognizes a distinction between remedies for rights of custody and rights of access. The violation of custodial rights may merit an order of return; that is not so for a violation of access rights. By drawing this distinction, the signatories recognized that not *all* parental disputes warrant direct intervention by courts of the State to which children are taken by one of the contending parties. In its hierarchical organization of parental rights, the Convention permits a remedy of return only for the parent with the superior rights: "rights of custody." It may be that Arce's access rights have been violated by Gutierrez's actions. The Convention, however, does not provide for the return of his children as a remedy for that violation. *Convention*, art. 21. Although Gutierrez

may be frustrating an important objective of the divorce decree, the "frustration of judicial power is not," as *Croll* points out, "the touchstone for a return remedy under the Convention." 229 F.3d 133 at 143.

■ A second and complementary purpose of the Convention is to ensure that parents do not manipulate jurisdictional differences to alter or avoid custodial agreements or orders that originated in the state in which the children lived prior to the dissolution of the marriage. *See* Elisa Perez–Vera, *Explanatory Report*, in 3 *Actes et documents del la Quatorzieme session* ¶ 16 (hereinafter "*Perez–Vera Report*")[16] In situations like the case before us, a foreign court has already determined the custodial rights between the parents. The explicit terms of the divorce agreement approved by the Mexican family court grant sole custody to Gutierrez. Allowing Gutierrez to remain here does not result in any change, legal or practical, to the custody provisions. By declining to recognize access rights coupled with a *ne exeat* clause as "rights of custody," we do not frustrate the original custodial arrangements, already adjudicated, between Arce and Gutierrez. Thus, our view of the *ne exeat* clause is consistent with, or at least not contrary to, two of the purposes of the Convention.

■ A third and lesser purpose of the Convention is to "secure protection for rights of access." *Convention*, preamble. Our interpretation of custody will undoubtedly result in some frustration of Arce's visitation rights, as traveling to the United States from Mexico will involve a not inconsiderable amount of time and expense.

---

**16.** The explanatory report of Elisa Perez–Vera is "recognized ... as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." *Hague Inter-* *national Child Abduction Convention; Text and Legal Analysis*, 51 Fed.Reg. 10494, 10503 (Mar. 26, 1986). Circuit courts, including this one, have relied in part on this explanatory report to interpret the Convention. *See, e.g., Shalit*, 182 F.3d at 1127–28.

Unfortunately, as a result, Arce will undoubtedly be able to see far less of his children. On balance, however, we conclude that our exclusion of a *ne exeat* clause from the Convention's definition of custody comports with the treaty's larger purposes of protecting children from wrongful removal, as defined in the Convention, and avoiding jurisdictional manipulation.

### 3. *Drafting History*

Our consultation of the Convention's drafting history also supports Gutierrez's position. As the Supreme Court has explained, "[b]ecause a treaty ratified by the United States is not only the law of this land ... but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (*travaux preparatoires*) ... of the contracting parties." *Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996).

The State of California, as *amicus curiae,* argues that the drafters of the Convention intended to construe rights of custody as broadly as possible. In particular, the State of California and Arce rely upon the report of the official Hague Conference Reporter, in which Perez–Vera explains that the Convention favors the interpretation of custody rights that would allow the "greatest possible number of cases to be brought into consideration." *Perez–Vera Report* ¶ 67. The Convention was drafted with the intent of encompassing many custodial situations emanating from many different legal regimes. When viewed in this context, the explanatory paragraph lends little support to Arce's position. Paragraph 67 introduces the three sources of rights from which custody may be identified. First, custody may arise by "operation of law," so that custodial rights may be found *ex lege,* even though a custodial decision has not yet been made. *Perez–Vera Report* ¶ 68. Second, custody may arise from a "judicial or administrative decision." Here, the drafters meant to encompass a variety of decisions, including those that had not been formally recognized. *Perez–Vera Report* ¶ 69. Third, custody rights may arise from "reason of an agreement having legal effect under the law of that State." Thus, custodial rights could be found even when the only agreement might be a private transaction between the parents. *Perez–Vera Report* ¶ 70. These examples demonstrate that the Convention's definition of custody is meant to reach the full range of custody arrangements, including those situations that are less formal than the paradigmatic legal arrangement in custodial disputes: a formal custody agreement, approved by a court of law and spelling out the rights and duties of the parents. It is this breadth of inclusion to which Perez–Vera referred when she spoke of the "greatest number of cases."

In addition, the drafting history makes it plain that the Convention's drafters considered and debated the general issue of access rights and declined to, or failed to agree upon, a remedy for a breach of these rights, with or without a *ne exeat* clause attached:

> Although the problems which can arise from a breach of access rights, especially where the child is taken abroad by its custodian, were raised during the Fourteenth Session, the majority view was that such situations could not be put in the same category as the wrongful removals which it is sought to prevent. This example, and others like it where breach of access rights profoundly upsets the equilibrium established by a judicial or administrative decision, certainly demonstrate that decisions con-

cerning the custody of children should always be open to review. This problem however defied all efforts of the Hague Conference to co-ordinate views thereon. A questionable result would have been attained had the application of the Convention, by granting the same degree of protection to custody and access rights, led ultimately to the substitution of the holders of one type of right by those who held the other.

*Perez–Vera Report* ¶ 65. Although Perez–Vera reports no discussions relating to *ne exeat* provisions, it is clear that the "majority view" of the Convention drafters was that the mandatory remedy of return ought not be available to the left-behind non-custodial parent. While the drafting history is silent as to the precise consequence of a *ne exeat* clause, we know that the drafters did consider the broader subject of access rights and declined to afford a remedy of return as protection for such rights. Accordingly, we are comfortable with our conclusion that "rights of custody" do not offer succor to non-custodial parents, even those with *ne exeat* orders.

### 4. *Post-ratification Understanding*

The post-ratification understanding of the Convention, which includes both case law from foreign nations and a subsequent treaty, does not provide us with clear guidance in deciding Gutierrez's claim.

#### a. *Cases of Signatory States*

■ We are cognizant that the "opinions of our sister signatories [are] entitled to considerable weight," *Air France v. Saks,* 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), and that one of the purposes of the Convention is to create a uniform body of international law among foreign courts. 42 U.S.C. § 11601(b)(3)(B). Because no clear consensus emerges from decisions of foreign Hague Convention cases, however, we are unable to derive any guiding principle from them. As the Second Circuit has observed, the cases of other signatory states on this question are "few, scattered, conflicting, and sometimes, conclusory and unreasoned." *Croll,* 229 F.3d at 143.

Two cases illustrate the divergent views on the characterization of *ne exeat* orders under the Convention. In *Thomson v. Thomson,* [1994] 119 D.L.R. (4th) 253, for example, the Supreme Court of Canada held that a *ne exeat* clause pursuant to an *interim* custody order did constitute "rights of custody" as understood under the Convention. In reaching this conclusion, however, Justice La Forest, writing for the Court, carefully limited the Court's decision:

> I would not wish to be understood as saying the approach should be the same in a situation where a court inserts a non-removal clause in a permanent order of custody. Such a clause raises quite different issues. It is usually intended to ensure permanent access to the non-custodial parent. The right of access is, of course, important but, as we have seen, it was not intended to be given the same level of protection by the Convention as custody. The return of a child in the care of a person having permanent custody will ordinarily be far more disruptive to the child since the child may be removed from its habitual place of residence long after the custody order was made. The situation also has serious implications for the mobility rights of the custodian.

*Id* at ¶ 69. With respect to cases in which *interim* custody orders have been issued, rights of custody, reasoned the Court, accrue to the *court* that issued the non-removal order, in order to enable it to preserve its jurisdiction over the pending custody dispute. *Id.* at ¶ 68. *See also*

*D.S. v. V.W.*, [1996] 134 D.L.R. (4th) 481 ¶ 43 (suggesting that insufficient distinction between access and custody rights would incorrectly provide parents with access rights a remedy not authorized under the Convention).

By contrast, in *C v. C*, 1 W.L.R. 654, 2 All E.R. 465 (1989), an English court of appeal held that a mother who moved out of Australia in violation of a *ne exeat* order violated the father's custody rights under the Convention. Specifically, the court reasoned that since the father could determine whether the child could live outside of Australia, he possessed the "right to determine the child's place of residence" under article 5. *C v. C*, however, is distinguishable from the case before us, because there the parents held rights of "joint guardianship" before the allegedly wrongful removal. Some cases from foreign jurisdictions have recognized rights of custody in situations where the non-custodial parent possessed access rights and nothing further. *See, e.g., In re B (a minor)*, 2 F.L.R. 249, Fam. 606 (1994)(English court holding that father who lacked formal custodial rights yet physically cared for child possessed "rights of custody"); *Dellabarca v. Christie*, [1999] N.Z.F.L.R. 97 (holding that father with access rights held "rights of custody"). To the extent that these cases equate access rights with custody rights for purposes of ordering removal, we find them unpersuasive: the cases simply fail to recognize the distinction explicitly set forth in the pertinent articles of the Convention.[17]

.b. *Reform Efforts*

We also note that subsequent efforts to reform the Convention have not clarified the rights of a non-custodial parent with a *ne exeat* order. In 1996, the delegates of the thirty-five Member States of the Hague Conference adopted the *Hague Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Co-operation in Respect of Parental Responsibility and Measures for the Protection of Children*, 35 I.L.M. 1391 (1996), an effort to reform the then current system.[18] Marisa Leto, *Whose Best Interest? International Child Abduction Under the Hague Convention*, 2 Chi. J. Int'l L. 247, 249 (2002).

Article 7 of the 1996 Convention on Jurisdiction copies verbatim the language of article 5 of the 1980 Convention, and thus creates the same distinctions between rights of custody and rights of access. The remedy of return is, again, available for the former and not the latter. In the official explanatory note to article 7 of the 1996 Convention, the Convention reporter explains that it "suffices here to make reference to the very complete explanations set out in the Report of Professor Elisa Perez–Vera on that Convention

17. For the same reasons, we disagree with the few American cases cited by Arce to show that non-custodial parents may possess "rights of custody" under the Convention. See *Fawcett v. McRoberts*, 168 F.Supp.2d 595, 605–606 (W.D.Va.2001)(noting that, *inter alia*, to deny non-custodial parent return remedy would deny rights of access); *Janakakis–Kostun v. Janakakis*, 6 S.W.3d 843, 849 (1999)(noting that visitation rights are sometimes rights of custody under the Convention); *David S. v. Zamira S.*, 151 Misc.2d 630, 574 N.Y.S.2d 429, 432 (1991)(finding "rights of custody" when custodial parent's "contemptuous conduct" violated non-removal order); *accord Croll*, 229 F.3d at 151 n. 8 (Sotomayor, J., dissenting)("[T]hese [three] cases are of limited utility because they fail ... to define 'custodial rights' or to differentiate them from access rights.").

18. Although the U.S. has not ratified the Convention, the State Department expects to authorize U.S. signature of the Convention. Harold S. Burman, Private International Law, 32 Int'l Law. 591, 596 (1998).

(paragraphs Nos. 64–74)." [19] From this, we know only that the drafters intended to incorporate the same distinctions in the 1996 Convention as existed in the 1980 Convention. Beyond this inference, we find no guidance for determining the effect of *ne exeat* orders.

In sum, the post-ratification understanding of the Convention provides little assistance with respect to the appropriate characterization of non-custodial parental rights with a *ne exeat* order. We rely instead on the other substantial sources of interpretive guidance. In light of the Convention's text, purposes, and drafting history, we hold that a *ne exeat* clause does not confer "rights of custody" upon a parent who otherwise possesses only access rights.

### B. Patria Potestas *Does Not Establish Rights of Custody*

In the alternative, Arce argues on cross-appeal that the Mexican legal concept of *patria potestas* confers upon him rights of custody under the Convention. We consider this issue as one of first impression. The concept of *patria potestas* is derived from Roman law and originally meant paternal power over the family and household. In common law legal systems, *patria potestas* was first replaced by *parens patriae* and eventually by the "best interests of the child" standard. *Whallon v. Lynn,* 230 F.3d 450, 457 n. 7 (1st Cir.2000). Many civil law countries, however, continue to recognize some form of *patria potestas.* In support of his claim, Arce relies upon *Whallon,* in which the First Circuit held that *patria potestas* conferred custody rights as understood under the Convention on both parents under Mexican law. Arce's reliance on *Whallon* is misplaced.

In *Whallon,* the court held that, in the absence of a custody agreement, it could rely upon *patria potestas* to determine custodial rights between two parents who had never married, and had never entered a formal custody agreement. 230 F.3d at 458 n. 9 (distinguishing *Croll,* where there had been "a clear determination of custody rights by a court of the country of habitual residence."). Here, unlike the situation in *Whallon,* the parties have executed a formal, legal custody agreement, thus eliminating any basis for relying on *patria potestas.* Thus, we hold that *patria potestas* does not confer "rights of custody" upon a parent given access rights from a custody agreement.

### CONCLUSION

We hold that a *ne exeat* clause intended to benefit a non-custodial parent who possesses access or visitation rights does not afford "rights of custody" to that parent under the Hague Convention on the Civil Aspects of International Child Abduction. We also hold that the Mexican legal concept of *patria potestas* does not confer "rights of custody" upon the non-custodial parent where a competent Mexican court has already decided the rights and obligations of both parents. Accordingly, we hold that the remedy of return is not available to a parent who possesses only access rights, even if he also benefits from the inclusion of a *ne exeat* clause in the relevant custody agreement. We REVERSE the judgment of the district court, with directions to dismiss the petition.

REVERSED.

---

**19.** *See* <http://www.hcch.net/e/conventions/exp134e.html>.