**Isaac LALO, Petitioner,**

v.

**Liliana MALCA, Respondent.**

**No. 03–22039–CIV.**

United States District Court,
S.D. Florida.
Miami Division.

May 12, 2004.

Robert Kanziger, Esq., Miami, FL, for Plaintiff.

Lawrence S. Katz, Esq., Miami, FL, for Defendant.

### *ORDER REJECTING MAGISTRATE'S REPORT AND RECOMMENDATION AND DENYING RESPONDENT'S MOTION TO DISMISS*

MORENO, District Judge.

Before the Court is an action brought by Petitioner Isaac Lalo for the return of his child to Panama, in what amounts to an international struggle for the care and support of a child. Respondent Liliana Malca moves this Court to dismiss Petitioner's claim for lack of subject matter jurisdiction because, she argues he lacks a claim of a right of custody. The motion

was referred to the Honorable Barry L. Garber, United States Magistrate Judge, for a Report and Recommendation. In his report, Magistrate Garber recommended, prior to recent Eleventh Circuit law, that this Court grant Respondent's motion to dismiss. However, because the Panamanian divorce decree includes a right by the father of *patria potestas* and the retention of a *ne exeat* right, this Court must deny the mother's motion to dismiss for lack of jurisdiction.

## I. BACKGROUND

Petitioner Isaac Lalo and Respondent Liliana Malca were married and resided in Panama with their son, Victor. Marital problems emerged, the parties divorced, and entered into a divorce decree. The decree provides the following custodial arrangement:

> Both parts decide that the Mother will have the guard and raising of the minor, Victor Lola Malca who will usually live with her, without damaging the right of the Father to a communication regime, visits, and to the shared *patria potestas* power, in accordance with which on the matter has been provided by the code of the family and the minor ... [1]

In addition, the divorce decree includes a *ne exeat* clause that requires the express consent of the remaining parent before a parent is allowed to emigrate with Victor from Panama and reside permanently in another country.[2] On August 5, 2002, Respondent removed Victor from Panama and emigrated permanently to the United States. Following recourse to Panamanian courts, where Respondent was ordered to return the child to Panama, Petitioner filed suit in this Court under The Convention of Civil Aspects of Child Abduction

("Hague Convention"). See implementing legislation at 42 U.S.C. § 11601 *et seq.*

## II. ANALYSIS

In her motion to dismiss, Respondent argues that the Court has no subject matter jurisdiction because in order to bring a claim under the Hague Convention for the return of a child, Petitioner must claim a right of custody. It is Respondent's contention that Petitioner retains no such right and as a result, his claim must be dismissed. This Court is of the opinion that the specific inclusion of *patria potestas* in the divorce decree, in addition to the presence of a *ne exeat* clause, requires the denial of Respondent's motion to dismiss for lack of jurisdiction.

It is true that in order to seek repatriation under the Hague Convention, a petitioner must retain a right of custody.[3] The Court agrees with Respondent and Magistrate Garber that a claim of a right of custody is necessary for this Court to retain jurisdiction to decide Petitioner's Hague Petition. However, as to the issue of whether a *ne exeat* right coupled with *patria potestas*, conferred on Petitioner in the divorce decree, amounts to nothing more than a right of access, this Court disagrees with Respondent.

### A. Purpose of the Hague Convention

■ Drafted in 1980 and formally implemented in the United States in 1988 as the International Child Remedies Act, 42 U.S.C. §§ 11601–11611 (1988), the Hague Convention's stated purpose is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Preamble to Hague

---

**1.** Petitioner's Trial Brief, at page 1.

**2.** Petitioner's Objection to Magistrate's Report and Recommendation, Exhibit G.

**3.** Hague Convention, Art. 3.

Convention. To achieve its objective, the Convention establishes the remedy of return of the child to his country of habitual residence. Hague Convention Arts. 3, 5, 12, and 13. The Convention's remedy of return is designed to reestablish the pre-abduction status quo and to deter parents from international forum-shopping in custody disputes. *Lops v. Lops,* 140 F.3d 927, 936 (11th Cir.1998)(citing *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir. 1996)).

### B. Rights of Custody

The Hague Convention defines "right of custody" as including "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, Art. 5(a). Further the Explanatory Report to the Convention states that "custody rights may arise by: (1) by operation of law; (2) by reason of a judicial or administrative decision; or (3) by reason of an agreement having legal effect under the law of the State." [4] In contrast, "rights of access" only include "the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention at Art. 5(b). Beyond this, the Convention provides little further guidance on the distinction between "rights of custody" and "rights of access". *See Whallon v. Lynn,* 230 F.3d 450, 455 (1st Cir.2000).

The Convention does however express the preference for interpreting custody rights in the context of the country in which the child was habitually resident. *Id.* Underlining this preference, the Elev-

enth Circuit has recently held that in applying the Hague Convention, "we must look to the definition of 'rights of custody' set forth in the Convention and not allow our somewhat different American concepts of custody to cloud our application of the Conventions terms." *Furnes v. Reeves,* 362 F.3d 702, 711 (11th Cir.2004). As a result, in order to determine whether Petitioner retains a right of custody sufficient to survive a motion to dismiss, the Court must look to Panamanian law in interpreting the parties' custodial arrangement.

### 1. Import of Patria Potestas

The notion of *patria potestas* predates the modern conception of custody rights, as distinguished from rights of access. The conception has its roots in Roman law [5] and it specifically referred to paternal power. A father's children were viewed as his chattel.[6] The father's rights in his children went beyond mere rights of custody, as presently conceived, to encompass something akin to ownership. Indeed, the definition that appears in Black's Law Dictionary underscores the paternal origins of *patria potestas.* It defines it as follows: "[t]he authority held by the male head of a family over his children and further descendants in the male line, unless emancipated." [7]

From Roman times, it appears that the conception of *patria potestas,* as an operative legal conception, took diverging paths in the common law and civil law legal traditions. In the common law legal tradition, *patria potestas* was eroded by the emergence of the conception of *parens patriae* in the Chancery Courts of England.[8]

---

4. Hague Convention, Appendix C. 51 Fed. Reg. 10,494 (1986).

5. JAMES HADLEY, INTRODUCTION TO ROMAN LAW 119–21 (1881).

6. JOAN B. KELLY, THE DETERMINATION OF CHILD CUSTODY, 4 THE FUTURE OF CHILDREN 121 (1994).

7. BLACK'S LAW DICTIONARY 1188 (7th ed.1999).

8. Maurice Wilcox, Note, *A Child's Due Process Right to Counsel in Divorce Custody Proceedings,* 27 HASTINGS L.J. 917, 920 (1976).

Beginning with the conception of *parens patriae,* courts began to move from the paternalistic view of children as chattel to the more utilitarian notion that children are potential citizens that deserve the state's protection.[9] In contrast, the notion of *patria potestas* seems to have survived in many of the world's civil law nations and evolved into a generalized parental right that now includes such duties as support and affection. See *Pesin v. Rodriguez,* 77 F.Supp.2d 1277, 1286 (S.D.Fla.1999).

Because the Hague Convention requires reference to the law of the country in which the child was habitually resident, it is necessary to determine the contours of *patria potestas,* as defined in the specific context of Panamanian law. The Panamanian Code of Minors, Article 319 provides:

> Patria potestas, with regard to sons or daughters, comprises the following sets of duties and powers:
>
> 1. To look after their life and health; keep them in their company; satisfy their needs for affection; feed them; educate them, and provide them with a comprehensive upbringing;
>
> 2. To reasonably and moderately correct them; and
>
> 3. To represent them and administer their assets.

It appears from Article 319 that *patria potestas,* in the context of Panamanian law, refers to a general parental duty to provide support, love, and nurturing. In addition, it includes specific of child-rearing duties of the parent as well as a duty to represent and administer the assets of the child.

Other courts have faced the difficult question of how to determine the import of the legal concept of *patria potestas.* The First Circuit was called upon to determine if *patria potestas* constitutes a right of custody and, after a lengthy discussion of the history of *patria potestas,* held that indeed *patria potestas* does confer a type of divisible custody right. *Whallon v. Lynn,* 230 F.3d 450, 458 (1st Cir.2000). In addition, in a case in the Middle District of Florida, the parties agreed that the concept of *patria potestas* bestows "rights of custody" sufficient to assert a claim for the return of a child under the Hague Convention. *Lynch v. Mendez,* 220 F.Supp.2d 1347, 1358 (M.D.Fla.2002).

Respondent asserts that this Court should find that *patria potestas* rights are limited to rights of access by the divorce decree, which in Respondent's view, grants full custody to Victor's mother, Liliana Malca. In support of this proposition, Respondent urges the Court to follow the Ninth Circuit's decision in *Gonzalez v. Gutierrez,* 311 F.3d 942 (9th Cir.2002). There, the Court distinguished *Whallon* by noting that where the parties had executed a custody agreement, without awarding *patria potestas* rights, the legal principle of *patria potestas* does not operate to accord custody rights. *Id.* at 954. As a result, Respondent argues that *Gonzalez,* and not *Whallon,* is controlling because, here the parties have executed a custody agreement.

However, at issue in *Gonzalez* was a custody agreement that *did not* award *patria potestas. Gonzalez* at 946–47. In *Gonzalez* the question was whether the principle of *patria potestas* could be invoked to create a right of custody where a formally executed custody agreement made no mention of it. *Gonzalez* at 954. Indeed, a fair reading of *Gonzalez* does not indicate that *patria potestas* is merely a right of access. Rather, *Gonzalez* stands

**9.** Kathryn L. Mercer, *A Content Analysis of Judicial Decision–Making: How Judges Use the Primary Caretaker Standard to Make a Custody Determination,* 5 WM. & MARY J. WOMEN & L. 1, 14 (1998).

for the proposition that formal custody agreements should be respected.

■ Reading *Whallon* and *Gonzalez* together, it appears that *patria potestas*, specifically incorporated in a custody agreement, must amount to a divisible custody right. Here, the parties' divorce decree specifically incorporates *patria potestas*, unlike the custody agreement in *Gonzalez*. *Gonzalez* at 946–47. In fact, the decree states Malca shall have the guardianship, or physical custody, of the child without damaging Lalo's shared *patria potestas*. Holding the parties to their custody agreement, this Court is persuaded that *patria potestas* amount to more than a mere right of access and confers a divisible custody right.

### 2. *Ne Exeat Clause*

In addition to the presence of *patria potestas* rights, Petitioner also retains a *ne exeat* right. A *ne exeat* right can generally be defined as the right to determine if a child may live outside a particular country.[10] The term *ne exeat* is the short form of *ne exeat republica*. Translated from latin, it stands for "let him not go out of the republic". Respondent argues that a *ne exeat* right is only a "veto right" and as a result, amounts to nothing more than a right of access. In support of this proposition, Respondent cites *Croll v. Croll*, 229 F.3d 133 (2d Cir.2000). There, given the opportunity to decide the nature of a *ne exeat* right, the Second Circuit held that a *ne exeat* right gives the non-custodial parent a reserve power to veto the child's geographical location and nothing more than mere leverage as to other parenting issues. *Id.* at 140. Furthermore, the Second Circuit's reasoning in *Croll* has subsequently been adopted by the Fourth and Ninth Circuits. *See Fawcett v. McRoberts*, 326 F.3d 491, 500 (4th Cir.2003), *cert. denied* —— U.S. ——, 124 S.Ct. 805, 157

L.Ed.2d 732 (2003); *Gonzalez v. Gutierrez*, 311 F.3d 942, 954 (9th Cir.2002).

Prior to March 10, 2004, this Court might well have found the cases from the Second, Fourth, and Ninth Circuits persuasive, if not authoritative, as the Eleventh Circuit had yet to address the issue. However, on March 10, 2004, the Eleventh Circuit handed down *Furnes v. Reeves*, 362 F.3d 702 (11th Cir.2004). In *Furnes*, the Eleventh Circuit explicitly disagreed with the *Croll* majority and held that a *ne exeat* right does constitute a right of custody. *Id.* at 719. The Court disagreed with the *Croll* court's characterization of a *ne exeat* right as a mere limitation on the right to determine the place of residence and was ultimately persuaded by the weight of foreign courts holding similarly that *ne exeat* rights constitute custody rights.

The Eleventh Circuit took particular issue with the Second Circuit's characterization of a *ne exeat* right as a mere limitation on the right to determine the place of residence. *Id.* at 719–20. In holding that it is only a limitation on the right to determine the place of residence, the Second Circuit situated *ne exeat* rights outside Article 5 of the Hague Convention, which refers to rights to determine the place of residence as a custody right.

■ In its analysis, the Eleventh Circuit observed that the *Croll* majority's characterization of *ne exeat* rights is, to a certain degree, arbitrary. The Court noted that viewing a *ne exeat* right as a mere limitation on the custodial parent's right to determine the place of residence can easily be reversed to hold that physical custody of a child is nothing more than a mere limitation on the non-custodial parent's right to live near his child. *Id.* at 720. Confronted with the arbitrariness of conceiving of a *ne exeat* right as a mere

---

**10.** See BLACK'S LAW DICTIONARY 1054 (7th Ed.1999).

limitation, the Court adjudged that a more appropriate characterization is as an independent right to determine the place of a child's residence.

For further confirmation, the Court looked to interpretations of other signatories to the Hague Convention. The Supreme Court has held that when a court faces the difficult task of interpreting the language of a treaty, the interpretations of sister signatories are to be given substantial moment. *See Air France v. Saks,* 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). After a careful survey, the Court found that a majority [11] of foreign courts view *ne exeat* rights as custody rights. Specifically, courts in the United Kingdom, Australia, South Africa, and Israel have found that *ne exeat* rights constitute custody rights. *Id.* at 717–18.

## III. CONCLUSION

All too often, children are left with parents that refuse support and affection. Here, the inverse appears to be the source of the problem: two parents, who obviously care very deeply for their son, are engaged in a legal struggle with the ultimate goal of remaining close to their child. This curious dilemma brings to mind the words of William Shakespeare that "[t]o be wise and love exceeds man's might."

At present, the Court is called upon to determine whether Petitioner Isaac Lalo retains a right of custody sufficient to continue his claim for the return of Victor to Panama. On this issue, the Court is convinced that the award of *patria potestas* in the divorce decree, coupled with Petitioner's *ne exeat* right, leads to the inescapable conclusion that Petitioner retains a sufficient right of custody to survive dismissal. Therefore, it is

**ADJUDGED** that United States Magistrate Judge Barry L. Garber's Report and Recommendation (**D.E. No. 36**), filed on *December 30, 2003* is **REJECTED.** Accordingly, it is further

**ADJUDGED** that Respondent's Amended Motion to Dismiss for Lack of Jurisdiction (**D.E. No. 18**), filed on *October 1, 2003* is hereby **DENIED.** Respondent shall file a responsive pleading to Petitioner's Amended Complaint no later than *June 11, 2004.*

---

**11.** The Court also noted that courts in France and Canada have held otherwise. The Court distinguished the French decision because the holding focused more on the mother's right of expatriation as opposed to the question of custody. *See Furnes,* 362 F.3d at 718.