In re B. DEL C.S.B. (minor).

**Ivan Nemecio Salmeron Mendoza, Petitioner,**

v.

**Geremias Brito Miranda, Respondent.**

**Case No. SACV 07–00290–CJC(ANx).**

United States District Court, C.D. California, Southern Division.

Dec. 3, 2007.

---

Ella R. Serrano and Jeffrey R. Witham, Dewey & LeBoeuf, LLP, Los Angeles, CA, for Petitioner.

Julian David Forman, Davis, Wright & Tremaine, Los Angeles, CA, for Respondent.

## MEMORANDUM OF DECISION

CORMAC J. CARNEY, District Judge.

### INTRODUCTION

Petitioner Ivan Nemecio Salmeron Mendoza ("Mr. Salmeron") seeks the Court's intervention under the authority of the Hague Convention and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq., to reunite him with his ten year old daughter whom he has not seen or spoken with in over four years. By invoking the Hague Convention and ICARA, Mr. Salmeron does not ask the Court to determine the proper custodian for his daughter. Instead, he asks that the Court determine in which jurisdiction, domestic or foreign, those custody proceedings should take place.

Brianna del Carmen Salmeron Miranda ("Brianna") was born in Mexico to her unmarried parents, Mr. Salmeron and Respondent Geremias Brito Miranda ("Ms. Brito") Both Mr. Salmeron and Ms. Brito were, and continue to be, citizens of Mexico. From her birth in 1997 until early 2001, Brianna lived with both parents in Acapulco Guerrero, Mexico. She traveled to the United States in 2001 at the age of four and stayed with Ms. Brito and her maternal grandmother in Garden Grove, California for several months. Overwhelmed by the financial demands and responsibilities of working and raising a young daughter at the same time, Ms.

Brito sent Brianna back to Mr. Salmeron's care in Mexico in June 2001. After spending a year living with her father and going to school in Mexico, Brianna traveled to the United States to visit her mother for summer vacation. Shortly after her arrival, the relationship between Mr. Salmeron and Ms. Brito deteriorated, partly because Ms. Brito was living with another man. Despite Mr. Salmeron's repeated requests, Ms. Brito refused to return Brianna to Mexico where she was already enrolled for the upcoming school year. Lacking a visa or other authorization to enter the United States legally, Mr. Salmeron was unable to visit his daughter or assert his right to shared custody of Brianna.

By filing a petition under the Hague Convention and ICARA, and commencing civil proceedings in this Court, Mr. Salmeron asks only that Brianna's custody be determined in the courts of Mexico, not the United States. Under these facts, the Court cannot disagree. A Mexican court is the appropriate forum to determine the custody of a ten year old Mexican child who was born and raised for four years in Mexico by her Mexican parents. Accordingly, Mr. Salmeron's petition is GRANTED.

## FINDINGS OF FACT

Ms. Brito and Mr. Salmeron met in Santa Ana, California in 1994 and began a romantic relationship shortly thereafter. At the time, Mr. Salmeron was twenty-four years old while Ms. Brito was only fourteen. Both were living illegally in the United States, Ms. Brito since the age of two. After spending several months together in California, the couple moved to Oregon in 1995 because Mr. Salmeron was offered a job in his brother-in-law's auto repair shop. By their own admissions, their relationship was troubled in Oregon. They used drugs, abused alcohol and frequently argued. In fact, Mr. Salmeron was once arrested for a domestic disturbance while Ms. Brito was pregnant.[1] Mr. Salmeron was arrested on two other occasions while in Oregon. He was present when his brother-in-law's home was raided for drugs. Although Mr. Salmeron was not charged with any drug-related crimes, he was deported—first to Arizona and then out of the country. Upon his return to Oregon, Mr. Salmeron was again arrested for driving under the influence ("DUI").

Instead of attending court proceedings related to his charges for DUI, Mr. Salmeron and Ms. Brito decided to move to Mexico in December 1996. The parties dispute whether the move to Mexico was intended to be permanent.[2] At the time, Ms. Brito was only eighteen years old and already six months pregnant with Brianna. In Mexico, the couple lived with Mr. Salmeron's mother, Roselia Mendoza ("Grandmother Salmeron"), in Acapulco Guerrero, Mexico.[3] It was during this time, on April 17, 1997, that the couple's

---

1. Ms. Brito did not present any evidence documenting Mr. Salmeron's arrest for domestic violence or the injuries she may have suffered. She further testified that Mr. Salmeron continued to abuse her during their time in Mexico. Mr. Salmeron, however, never admitted that he physically abused Ms. Brito and testified that he was arrested only because of a heated argument with her.

2. Mr. Salmeron testified that the couple had no plans to return to the United States, whereas Ms. Brito testified that Mr. Salmeron told her the move was temporary and the

couple would return to the United States. Ms. Brito's testimony on this fact was contradicted at trial by her deposition testimony, read into the record of this proceeding, where she stated that there was no plan to return to the United States in the future.

3. While the parties referred to the home as Grandmother Salmeron's, Mr. Salmeron testified that he had inherited the home (presumably from his father) and that fifty percent was owned by his mother and fifty percent was owned by him.

daughter Brianna was born. Mr. Salmeron held at least one job in Mexico, and Ms. Brito and Grandmother Salmeron shared caretaking responsibilities for Brianna while Mr. Salmeron worked. The couple spent four years together in Mexico under this same general living arrangement.[4] Mr. Salmeron testified that they even planned to be married.

In February or March 2001, Ms. Brito and Brianna traveled to the United States, albeit under disputed circumstances. Mr. Salmeron testified that Ms. Brito and Brianna went to the United States to visit Ms. Brito's mother in California. Ms. Brito testified that she and Mr. Salmeron had earlier reached a decision to return to the United States because of their difficult financial situation in Mexico. She and Brianna moved ahead of Mr. Salmeron, who said he would eventually follow them to the United States. The parties do not dispute, however, that Mr. Salmeron and Ms. Brito planned to reunite.[5] Mr. Salmeron testified that after Ms. Brito left for the United States, he continued to work while simultaneously applying for a new job. It was his understanding that Ms. Brito and Brianna would return to Mexico if he were offered the job. If not, he would use the money he had saved to enter the United States. Ms. Brito, on the other hand, testified that there was no plan to return to Mexico if Mr. Salmeron was offered the job; the only plan was that he would reunite with Ms. Brito and Brianna in the United States.

After entering the United States illegally, Ms. Brito and Brianna lived with Ms. Brito's mother, Michaela Miranda ("Grandmother Brito"), in Garden Grove, California. Ms. Brito found employment at a nearby fast food restaurant. During their separation, Mr. Salmeron, Ms. Brito and Brianna kept in regular contact through letters, pictures and telephone calls. After only a few months in the United States, Ms. Brito learned she could not enroll Brianna in school in Garden Grove because Brianna had not yet reached five years of age. Around the same time, Ms. Brito lost her job. Unable to pay for childcare for Brianna, and unwilling to place an additional burden on Grandmother Brito, who already cared for two young children, Ms. Brito decided to send Brianna back to Mexico to live with Mr. Salmeron.

In June 2001, Grandmother Salmeron picked up Brianna from Ms. Brito and accompanied her back to Mexico where Brianna was reunited with Mr. Salmeron. Mr. Salmeron promptly enrolled Brianna in a private summer school and made arrangements for her to begin kindergarten in September. Again, Mr. Salmeron, Ms. Brito and Brianna kept in close contact through letters and telephone calls. According to Mr. Salmeron, the couple discussed their planned reunification and

---

**4.** By Ms. Brito's account, the relationship continued along a troubled path in Mexico. She testified that Mr. Salmeron was physically abusive to her. She also testified he was arrested several times for various concealed weapons and drug-related charges. She claims she was forced to bribe Mexican officials to release him from jail and refrain from pressing charges. Moreover, Ms. Brito testified that Mr. Salmeron was unfaithful to her while the couple lived in Mexico. However, Ms. Brito did not present any evidence substantiating her claims, whereas Mr. Salmeron submitted an uncertified government report

from Mexico stating that he has no criminal record. (Exh. 34.) Mr. Salmeron's version of events was further corroborated by the testimony of Grandmother Salmeron.

**5.** In her deposition testimony, read into the record for impeachment purposes, Ms. Brito stated that she considered her romantic relationship with Mr. Salmeron to have ended upon her departure for the United States. She freely admitted, however, that she did not disclose her understanding of the status of the relationship to Mr. Salmeron.

their shared desire to live together as a family. But, unbeknownst to Mr. Salmeron, Ms. Brito's life had changed substantially during the couple's separation. She had moved out of Grandmother Brito's home and into an apartment in Huntington Beach, California sometime prior to February 2002.[6] More importantly, Ms. Brito had begun a romantic relationship with another man, Aiden Aguilar, and had moved in with him in December 2001. The existence of this relationship would not be disclosed to Mr. Salmeron until August 2002.

Against this backdrop, Brianna returned to the United States to live with Ms. Brito in June 2002, one week short of completing a full school year in Mexico. The parties vigorously dispute their agreement with respect to Brianna's return to the United States. According to Mr. Salmeron, Brianna was only visiting Ms. Brito during her summer vacation because Ms. Brito was ill. The couple had not agreed that Brianna would stay in the United States permanently and he had already registered Brianna for the 2002–2003 school year based on the understanding she would return.[7] Mr. Salmeron could not accompany Brianna to the United States because he could not legally enter the United States. Ms. Brito, on the other hand, testified that Brianna joined her in the United States because Mr. Salmeron agreed she could live there permanently. Ms. Brito had no plans to return Brianna to Mexico for the upcoming school year.[8] She expected Mr. Salmeron to enter the United States and live with her and Brianna according to their plan.

Several months after Brianna began living with Ms. Brito in Huntington Beach, tensions between Mr. Salmeron and Ms. Brito escalated. Again, the parties offer differing explanations for these events. Mr. Salmeron testified that during an August 2002 telephone conversation with Brianna, she told him that Ms. Brito had a new boyfriend and that she would soon have a new little brother. Ms. Brito admitted to the relationship shortly thereafter and told Mr. Salmeron that Brianna would remain with her in the United States. Despite as many as five requests from Mr. Salmeron, Ms. Brito would not allow Brianna to return to Mexico. According to Mr. Salmeron, Ms. Brito eventually did not allow Brianna to speak with Mr. Salmeron because she would cry to her mother about her desire to see her father. Because this bothered Ms. Brito, she did not allow Mr. Salmeron to speak to Brianna.

By Ms. Brito's account, however, she was forced to end communications with Mr. Salmeron after he made a number of harassing telephone calls in the middle of the night. Ms. Brito testified that Mr. Salmeron was intoxicated when making the phone calls, and that they upset her, Brianna and Grandmother Brito. Brianna did not want to talk to Mr. Salmeron because of the telephone calls. In order to stop the late-night telephone calls, Ms. Brito was forced to change her telephone number.[9]

6. While the parties did not establish the date Ms. Brito moved to Huntington Beach, Ms. Brito introduced a DHL Worldwide Express receipt dated February 26, 2002 as evidence that Mr. Salmeron knew of Ms. Brito's Huntington Beach address by, at the latest, February 2002.

7. (Exh. 30.)

8. When asked whether there was "any plan" to send Brianna back to Mexico, Ms. Brito testified, "No. I didn't have one." (11/6/07 Tr., 88:10–12.)

9. The Court did not find Ms. Brito's testimony credible on this point. Ms. Brito described how Grandmother Brito would answer Mr. Salmeron's late night telephone calls. But, in 2002, Ms. Brito was no longer living with

Mr. Salmeron ceased pleading for Brianna's return to Mexico after Ms. Brito repeatedly refused; he requested only an ability to visit with and speak to his daughter. He had little leverage as Brianna was living in the United States with her mother, and he was unable to enter the country legally. Ultimately, Mr. Salmeron was denied the opportunity to speak to Brianna. His last conversation with her prior to this proceeding was in January 2003. In search of his daughter, Mr. Salmeron first contacted Grandmother Brito. She told him that Ms. Brito had moved and changed her telephone number, and that Ms. Brito forbade Grandmother Brito from disclosing the new number to Mr. Salmeron.[10] Upon calling the number he believed to be Ms. Brito's, Mr. Salmeron heard a message stating that she could no longer be reached at that number. Furthermore, Mr. Salmeron did not write to Ms. Brito or Brianna at the Huntington Beach address because he was told by Grandmother Brito that the two no longer lived there.

Frustrated and upset, Mr. Salmeron appealed to Grandmother Salmeron for assistance. She visited the Mexican consulate on his behalf but was told that only officials in Acapulco could help. In Acapulco, Mr. Salmeron first visited with family reunification officials in the office of Family Integration Services. He was referred to the Minors Protection Department in Chilpancingo, Mexico, which he visited on four separate occasions. In addition, Mr. Salmeron made the twelve hour round-trip drive to the Department of State in Mexico City as many as eighteen times. At the Department of State, Mr. Salmeron was given an application to begin the Hague petition process. He submitted the application in Spanish and was told that he was required to attach a copy translated into English. A seven month delay ensued while Mr. Salmeron mailed the Spanish version to Grandmother Salmeron in the United States for translation.

Mr. Salmeron's Hague application was finally submitted for processing on March 26, 2004.[11] On April 2, 2004, the Mexican Central Authority transmitted the application to the United States Central Authority where it was received on April 23, 2004.[12] The National Center for Missing and Exploited Children ("NCMEC") received the application from the United States Central Authority on April 26, 2004, and forwarded a copy to the Office of the Attorney General of California.[13] During the processing of the application, Mr. Salmeron occasionally slept outside the doors of the Mexican Department of State in order to personally visit with officials to inquire about the status of his application. Also during the processing period, Mr. Salmeron sent gifts and money to Brianna through Grandmother Salmeron. Grandmother Salmeron would hand deliver the

Grandmother Brito; she had moved to an apartment in Huntington Beach. There is no evidence that Grandmother Brito ever resided with Ms. Brito in the Huntington Beach apartment. (*See* 11/6/07 Tr., 85:17–23.) Instead, the allegedly harassing telephone calls are more likely to have occurred in 2001 when Ms. Brito lived in Grandmother Brito's home. (*See also id.* at 89:21–25 (testifying that Brianna was four years old at the time of the calls).) As such, the purported calls are unlikely to have been the actual grounds for Ms. Brito's decision to change her telephone number in 2002.

10. While Ms. Brito testified that she did not forbid Grandmother Brito from disclosing her number to Mr. Salmeron, her contradictory deposition testimony was read into the record in which she stated that she instructed her mother not to give Mr. Salmeron her new telephone number.

11. Joint Exh. of Stip. Facts, 1.

12. *Id.* at 2–3.

13. *Id.* at 4.

gifts to Grandmother Brito, who would in turn deliver them to Brianna. Over two years later, on July 27, 2006, NCMEC located an address for Ms. Brito and Brianna.[14] This information was subsequently confirmed by the Orange County District Attorney's office in late February 2007.[15] Mr. Salmeron then filed this petition in the United States District Court for the Central District of California on March 9, 2007 and requested an expedited evidentiary hearing.

## CONCLUSIONS OF LAW

■ The Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention") is designed to secure "international cooperation regarding the return of a child wrongfully taken by a parent from one country to another...." *Gonzalez v. Gutierrez*, 311 F.3d 942, 944 (9th Cir.2002) (*citing Mozes v. Mozes*, 239 F.3d 1067, 1069 (9th Cir.2001)). Both the United States and Mexico are parties to the Convention.[16] By its terms, a parent may bring a civil action in the country to which the child was wrongfully retained seeking return of the child to her country of habitual residence. *Mozes*, 239 F.3d at 1070. The reviewing court does not determine custody in a Hague Convention proceeding; the court merely determines whether the child should be returned to her place of habitual residence for custody proceedings under that country's domestic law.

*Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir.2004); *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir.1999). Under U.S. law, the Convention is implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq., with the California Attorney General's office acting as the Central Authority for the state of California.[17]

■ The retention of a child is "wrongful" under Article 3 of the Convention where:

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Convention*, art. 3. It is the petitioner's burden to establish a "wrongful" retention. *See* § 11603(e)(1). Hence, the petitioner must prove the child's place of habitual residence immediately prior to the retention, that the retention breached the petitioner's custody rights under the laws of the nation of habitual residence, and that the petitioner was exercising those custody rights at the time of the retention. *See Mozes*, 239 F.3d at 1070; *Humphrey v.*

---

14. *Id.* at 5.

15. *Id.* at 6.

16. While the United States is a signatory to the Convention, Mexico is not. Because Mexico was not yet a member of the Hague Conference on Private International Law, the nation could not ratify the Convention. Therefore, in order to join the Convention, Mexico was required to accede to the Convention and have that accession accepted by each individual signatory nation. The United States accepted Mexico's accession to the

Hague Convention on October 1, 1991. *See Gonzalez*, 311 F.3d at 944 n. 2.

17. By its terms, each nation is required to designate a Central Authority to discharge its duties under the Hague Convention. A nation with more than one system of law or having autonomous territorial organizations may appoint multiple Central Authorities. *Hague Convention on the Civil Aspects of International Child Abduction, opened for signature* October 25, 1980, T.I.A.S. 11,670, art. 6 *reprinted in* 51 Fed.Reg. 10,494 (March 26, 1986) (hereinafter *"Convention"*).

*Humphrey,* 434 F.3d 243, 246 (4th Cir. 2006). The respondent then bears the burden of establishing the applicability of any of the four affirmative defenses set out by the Convention to prevent the child's repatriation. *Convention,* arts. 12, 13, 30; § 11603(e)(2); *see also Gonzalez,* 311 F.3d at 945.

For purposes of the present petition, there are three areas of dispute between the parties. First, Ms. Brito argues that Brianna's place of habitual residence is the United States, not Mexico, and therefore Mr. Salmeron has not met his initial burden under the Hague Convention of proving that Brianna was "wrongfully" retained. Second, Ms. Brito argues that Mr. Salmeron's petition was not filed within one year of the allegedly wrongful retention and during that time, Brianna became well-settled in the United States. Mr. Salmeron counters that the one year filing period should be equitably tolled because Ms. Brito concealed Brianna's whereabouts, thereby causing the delay. Finally, Ms. Brito raises as an affirmative defense that Mr. Salmeron forfeited his custody rights and acquiesced to Brianna's retention in the United States. In addition, the Court must determine whether Brianna has reached the requisite level of age and maturity that her wishes should be considered in reaching a decision on Mr. Salmeron's petition.

### 1. Brianna's Country of Habitual Residence Prior to Her Retention

Mr. Salmeron alleges that Ms. Brito's retention of Brianna was wrongful because Brianna was habitually resident in Mexico immediately prior to her retention in the United States. Ms. Brito, however, argues

that Brianna was habitually resident in the United States and therefore her retention was not wrongful. To determine if Brianna's retention was in fact wrongful, the Court must answer, "(1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident?" [18] *Mozes,* 239 F.3d at 1070.

Ms. Brito's retention of Brianna took place when she refused Mr. Salmeron's repeated requests for Brianna to return to Mexico to begin the 2002–2003 school year. *See Falls v. Downie,* 871 F.Supp. 100, 102 (D.Mass.1994) (placing the date of retention when the petitioner asks for the child's return and the respondent refuses); *Slagenweit,* 841 F.Supp. at 270 (setting the retention date at the time when "the noncustodial parent asserts [his] rights of custody"). While Mr. Salmeron did not establish the exact dates of his requests for Brianna's return, they occurred sometime between Ms. Brito's disclosure of her new romantic relationship in August 2002 and Mr. Salmeron's last conversation with Brianna in January 2003. More precisely, Mr. Salmeron's requests that Brianna return to Mexico to begin schooling are most likely to have occurred in late August through September, just ahead of the traditional time period for beginning a new school year. Thus Ms. Brito's retention of Brianna occurred in or about fall 2002. Setting an exact date within that time period is unnecessary as the dispositive issue is the parties' shared intent with respect to Brianna's entrance into the United States in June 2002. *See Holder,* 392 F.3d at 1015 n. 5 (declining to

---

**18.** Ms. Brito does not challenge the other elements of Mr. Salmeron's prima facie burden: that Brianna's retention breached Mr. Salmeron's rights of custody under the laws of Mexico, and that Mr. Salmeron was exercising those rights of custody at the time of

the retention. Ms. Brito does challenge, however, whether Mr. Salmeron forfeited or failed to exercise his custody rights over Brianna after the allegedly wrongful retention. *See infra,* part 3.

establish an exact date of the retention under "murky" circumstances because it was ultimately immaterial to the analysis). For these reasons, Brianna's retention was only wrongful if she was habitually resident in Mexico immediately prior to fall 2002.

The parties do not dispute that Brianna was habitually resident in Mexico for the first four years of her life. She was born in Mexico, and was raised by her Mexican parents and Mexican grandmother. During that time period, Mexico was "the locus of [Brianna's] family and social development," and thus her place of habitual residence. *See Mozes,* 239 F.3d at 1084; *see also In re Application of Adan,* 437 F.3d 381, 392 (3d Cir.2006) (finding a child born to Argentinean parents who lived in Argentina since the age of three months, attended school in Argentina, and made only two brief visits to the United States was a habitual resident of Argentina). The operative issue then becomes whether Brianna became habitually resident in the United States at any time between 2001 and fall 2002.

While the Hague Convention does not define when a child is "habitually resident" in a particular country, the Ninth Circuit set forth an analytical framework through which the district court should evaluate the facts in *Mozes v. Mozes. See* 239 F.3d at 1071, 1075–81. In order for a child to adopt a new habitual residence, there must first be a settled intention to abandon the prior one. *Id.* at 1075–76. For a child who is incapable of making an autonomous decision as to her place of residence, "[p]arental intent acts as a surrogate for" the child's intent. *Holder,* 392 F.3d at 1016–17 (*citing Mozes,* 239 F.3d at 1076).

■ Where the child's place of habitual residence is disputed in proceedings under the Hague Convention, a settled intention shared by each parent is rare. *See Mozes,* 239 F.3d at 1076. If the child's change of

location is intended "to be of a specific, delimited period," the place of habitual residence does not change. *Id.* at 1077; *see Freier v. Freier,* 969 F.Supp. 436, 438 (E.D.Mich.1996) (finding no change in habitual residence when the mother informed the father that she and the child were vacationing with family for one month); *Flores v. Contreras,* 981 S.W.2d 246, 248 (Tex.Ct.App.1998) (finding no change of habitual residence when the child visited Texas for a two week vacation).

However, if the "petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration," determining intent becomes more difficult. *Mozes,* 239 F.3d at 1077. The court must closely examine the "historical and narrative facts" to deduce the shared intent of the parents at the time the petitioning parent consented to the child's travel. *Id.* at 1078 (*citing Feder v. Evans–Feder,* 63 F.3d 217, 222 n. 9 (3d Cir.1995)). If those facts indicate the parents contemplated further negotiation over the duration of the child's stay, a mutual intent to abandon should not be inferred. *Id.* at 1077; *see, e.g., Meredith v. Meredith,* 759 F.Supp. 1432, 1433 (D.Ariz.1991) (finding no shared intent when the petitioner suggested that the respondent take the children to France to visit the respondent's parents for an unspecified duration). On the other hand, abandonment may be inferred if the Court determines that, "despite the lack of perfect consensus," the parties understood the stay abroad might last indefinitely. *Mozes,* 239 F.3d at 1077; *see, e.g., Slagenweit v. Slagenweit,* 841 F.Supp. 264, 269 (N.D.Iowa 1993) (concluding that the parties "mutually agreed" the child would stay in the respondent's custody for an indefinite period of time); *Levesque v. Levesque,* 816 F.Supp. 662, 667 (D.Kan.1993) (same).

If there is a settled mutual intent to abandon the child's habitual residence, the child must then affirmatively adopt a new one. *Mozes*, 239 F.3d at 1078. To do so, there must be an actual change in the child's geographic location, and the passage of an appreciable period of time sufficient for the child to become acclimated to the new environment. *Id.* ("[H]ome isn't built in a day.")

■ Mr. Salmeron and Ms. Brito did not share a settled intent sufficient to establish an abandonment of Brianna's habitual residence in Mexico with respect to Brianna's June 2002 entry into the United States.[19] Mr. Salmeron fully consented to Brianna's travel to the United States. It was his understanding that Brianna would visit her mother during her summer vacation because Ms. Brito had become ill. Having already registered Brianna for the school year beginning the following September, and having taken no action to postpone or cancel that registration, Mr. Salmeron's belief that Brianna would return to Mexico was entirely reasonable, and his testimony on this point was credible. Brianna's trip, in this respect, was one of a "specific, delimited period" insufficient to abandon her habitual residence. *See Mozes*, 239 F.3d at 1076; *Freier*, 969 F.Supp. at 438. Ms. Brito's testimony further supports the conclusion that there was no shared intent between the parents. She testified that the decision for Brianna to remain in the United States was hers alone. (*See* 11/6/07 Tr., 88:10–12 ("Q: Was there any plan at that time [fall of 2002] to send Brianna back to Mexico? A: No. I didn't have one.")) Ms. Brito's unilateral intent that Brianna remain in the United States is insufficient to establish an abandonment of Mexico as Brianna's habitual residence, especially when Mr. Salmeron operated under a reasonable belief that Brianna's visit would not extend past the end of the summer. *See Mozes*, 239 F.3d at 1077 (requiring "mutual abandonment" of the child's habitual residence).

In support of her position that Brianna abandoned her habitual residence in Mexico by traveling to the United States in June 2002, Ms. Brito claims that she and Mr. Salmeron reached a mutual agreement to reunite as a family in the United States. She testified Mr. Salmeron sent Brianna to the United States ahead of him because he was unable to secure papers for legal entrance or save enough money to finance an illegal entrance. Even if the Court were to find Ms. Brito's account credible, it nonetheless fails to establish a shared intent between the parties that Brianna would remain in the United States indefinitely. Ms. Brito considered her romantic relationship with Mr. Salmeron to have

---

**19.** There can be no dispute that Brianna did not abandon Mexico as her habitual residence during her brief visit to the United States in 2001. First, Mr. Salmeron offered credible testimony that Brianna's 2001 trip to the United States was for the purpose of visiting Ms. Brito's mother. While the family maintained a shared intent to reunite, whether that reunification happened in the United States was open to negotiation based on Mr. Salmeron's employment prospects. Given that the length of stay was "open to negotiation," *see Mozes*, 239 F.3d at 1077, the Court cannot infer a shared intent to abandon Mexico as Brianna's place of habitual residence. *See id.; Meredith*, 759 F.Supp. at 1433 (finding no change of habitual residence was when petitioner allowed respondent to take their children to visit her parents in France for an unspecified duration). Furthermore, the length of time Brianna was in the United States—three to four months—was insufficient for her to become acclimated to her new environment for the purposes of adopting a new place of habitual residence. *See Mozes*, 239 F.3d at 1079. There is no evidence, for example, that Brianna attended school or daycare, attended church, or became otherwise connected to her community. For these reasons, Brianna remained a habitual resident of Mexico despite her brief visit to the United States in 2001.

ended upon her return to the United States in February or March of 2001. And, she became involved in a romantic relationship with another man by December 2001 at the latest, seven months before Mr. Salmeron sent Brianna to the United States in June 2002. These facts were not disclosed to Mr. Salmeron in June 2002. The Court cannot conclude that a *shared* intent can exist if Mr. Salmeron's alleged agreement to the family's reunification was premised on purposefully false or misleading statements of future events by Ms. Brito. *Cf. Zuker v. Andrews,* 2 F.Supp.2d 134, 139–40 (D.Mass.1998) (choosing a retention date beneficial to petitioner when respondent deceived petitioner about her true intentions with respect to the future of their relationship).[20]

Nor do the objective facts indicate that the United States had unequivocally become Brianna's home by Fall 2002. *See Mozes,* 239 F.3d at 1081 (cautioning that courts should be slow to infer a change of residence based on objective facts when the parents do not share a settled intent with respect to the child's residence). From June 2002 until Fall 2002, Brianna lived in a Huntington Beach apartment she had never lived in before,[21] with Ms. Brito's boyfriend whom she had never met before. She had yet to attend school in the United States. By contrast, Brianna attended summer school and almost one full academic year of kindergarten in Mexico. She made friends at the Mexican

school and became close with her family, including her cousin Jonathan. Upon her departure, Brianna's bedroom, clothing and other personal items remained in Mexico awaiting her return. In light of these facts, the Court cannot conclude that Brianna's home had unequivocally become the United States by Fall 2002, especially in the absence of settled mutual intent on the part of her parents. *See Papakosmas,* 483 F.3d at 621; *Ruiz,* 392 F.3d at 1256. Accordingly, Brianna was "habitually resident" in Mexico immediately prior to her retention in the United States by Ms. Brito.

**2. The Timeliness of Mr. Salmeron's Hague Application**

■ Ms. Brito argues that as Mr. Salmeron's Hague application was filed over one year after the allegedly wrongful retention, it should be denied because Brianna has become well-settled in the United States. An application under the Hague Convention is not subject to a traditional statute of limitations period. Instead, if the petition is filed with the district court over one year after the retention, it becomes subject to the well-settled defense. *See Convention,* art. 12; 42 U.S.C. § 11603(e)(2)(B). The well-settled defense prevents a child's return to her place of habitual residence when the child has become "connected to the new environment so that ... return would be disruptive

---

**20.** These circumstances are analogous to cases where courts have found no shared intent to abandon a child's habitual residence when the child's relocation was conditioned on other events. *See, e.g., Papakosmas v. Papakosmas,* 483 F.3d 617, 625 (9th Cir.2007); *Gitter v. Gitter,* 396 F.3d 124, 135 (2d Cir. 2005); *Ruiz v. Tenorio,* 392 F.3d 1247, 1249 (11th Cir.2004). In *Ruiz* for example, the Eleventh Circuit affirmed the district court's determination that the child's habitual residence did not change when the petitioner and respondent moved to Mexico with the child in

order to repair their marriage. There, the child's change of residence was conditioned on the continuing viability of the couple's marriage. Here, assuming the truth of Ms. Brito's testimony about the couple's plan to reunite, any intent on Mr. Salmeron's part for Brianna to abandon Mexico as her residence was implicitly conditioned on the family's reunification.

**21.** During Brianna's first visit to the United States in 2001, she lived in Grandmother Brito's Garden Grove home.

with likely harmful effects." *Zuker*, 2 F.Supp.2d at 141 (*quoting In re Robinson*, 983 F.Supp. 1339, 1345 (D.Colo.1997)) (internal quotations omitted).

Mr. Salmeron argues that under the principle of equitable tolling, the one year period for commencing a civil action should begin February 2007, the date when the Orange County District Attorney's office ("OCDA") confirmed Brianna's location. *See, e.g., Furnes v. Reeves*, 362 F.3d 702, 723–24 (11th Cir.2004) (tolling the one year filing period when the respondent concealed the child and the petitioner had undertaken "extensive efforts" to locate the child). And because his petition was filed on March 9, 2007, less than two months after Brianna's location was confirmed by the OCDA, the well-settled defense should not apply.

It is unnecessary for the Court to decide Mr. Salmeron's equitable tolling argument because Brianna is not well-settled in the United States.[22] Courts evaluating the degree to which a child has become well-settled have considered a number of factors bearing on the child's connection to the community: the child's age, the stability of the child's home, regular attendance at school or daycare, regular attendance at church, the stability of the mother's employment, and the nature and proximity of friends and relatives. *In re Ahumada Cabrera*, 323 F.Supp.2d 1303, 1314 (S.D.Fla. 2004) (citations omitted); *see also In re Robinson*, 983 F.Supp. at 1346 (considering the children's age, length of time in their present living environment, success in school and involvement in extracurricular activities). Where appropriate, courts have also examined the effect of immigration status on the child's settlement. *See Cabrera*, 323 F.Supp.2d at 1314 (considering the threat of deportation when analyzing the child's well-settled status); *In re Koc*, 181 F.Supp.2d 136, 154 (E.D.N.Y. 2001) (noting that the child and mother had each overstayed their visas which suggested the child was not well-settled in the United States); *Giampaolo v. Erneta*, 390 F.Supp.2d 1269, 1282 (N.D.Ga.2004) (finding that the child's immigration status weighed against a finding of settlement even though the child's mother had applied for citizenship).

■ Here, there is no dispute that Brianna has developed significant connections to the United States. Since her return to the United States, she has lived in the same Huntington Beach apartment with Ms. Brito and Ms. Brito's boyfriend, a period of over five years. She regularly attends school and has achieved academic and interpersonal success at every grade

---

22. While Mr. Salmeron's equitable tolling argument need not be decided, the Court nevertheless found Mr. Salmeron's testimony going to the merits of his equitable tolling claim credible. In brief, Mr. Salmeron was told that Ms. Brito and Brianna no longer lived at the Huntington Beach address. Ms. Brito changed her telephone number and instructed Grandmother Brito not to disclose her new telephone number to Mr. Salmeron. Mr. Salmeron included Grandmother Brito's address on his Hague application in reliance on those facts, and because he was instructed to do so by Mexican officials. From this, the Court may conclude that Ms. Brito purposefully concealed Brianna's whereabouts from Mr. Salmeron. His efforts to locate Brianna were reasonably diligent given his immigration status, resources and familiarity with the legal system. *See Van Driessche v. Ohio–Esezeoboh*, 466 F.Supp.2d 828, 850–51 (S.D.Tex. 2006) (considering the petitioner's familiarity with international legal proceedings in evaluating the diligence of petitioner's search). The parties have stipulated that the OCDA did not confirm Brianna's address until early 2007. Mr. Salmeron's petition was filed with this Court shortly thereafter. *See Furnes*, 362 F.3d at 723 (calculating the one year filing period from the date the child's location was confirmed when the respondent concealed the child's location). Mr. Salmeron's request that the one year filing period be tolled until early 2007 is entirely reasonable under these facts.

level. Brianna is also active in extra-curricular activities, has made many friends among her peers, and visits with relatives on Ms. Brito's side of the family during holidays and other family gatherings. However, Brianna's connection to the United States is undermined by the uncertain foundation upon which it is built. Neither she nor her mother are legal residents of the United States. Both are subject to deportation at any time. As the U.S. District Court for the Southern District of New York wrote in *In re Koc:*

> The fact that the Immigration Service may not be looking to deport them at this time does not, in any way, guarantee that that position will not change in the future or that [the child] and her mother will ultimately become legal permanent residents of this country.

181 F.Supp.2d at 154. The threat of deportation is not simply an isolated factor—such as a parent's inability to find employment or the lack of nearby relatives—which weighs against finding Brianna to be well-settled. Instead, it is a constant danger to Brianna's well-being, threatening to undermine each and every connection to her community that she has developed in the past five years.

Without question, returning Brianna to Mexico will create some disruption to her short-term stability and happiness. However, this temporary disruption pales in comparison to the limitations her immigration status will place upon her as she matures into adulthood.[23] When she turns sixteen, Brianna cannot get a driver's license. If she chooses to attend college, her opportunity to win financial aid may be restricted. If Brianna chooses to work,

her employment prospects may be limited to low-wage work.[24] In the absence of employer-sponsored health care, affordable health care insurance for an illegal immigrant may not exist.[25] This is not a fate that should befall a child of Brianna's intelligence and promise. The bright future to which she is otherwise entitled may unfortunately be out of reach as an undocumented immigrant. In Mexico, Brianna will not face these same limitations. And, she will have a full opportunity to apply to return to this country legally, should she so choose. The well-settled defense is intended to prevent harm to the child, and it must be applied in a way that effectuates that purpose. *See Zuker,* 2 F.Supp.2d at 141. Finding Brianna to be well-settled despite her uncertain immigration status would only exchange a temporary harm (the uncertainty of returning to Mexico) for a long-term one (the substantial barriers presented by her immigration status). *See Cabrera,* 323 F.Supp.2d at 1314 ("[T]he Court finds that it is better for the child to return to Argentina now than for *her to deported at a later date when she becomes firmly settled in the United States.").*

After considering all the evidence presented with respect to Brianna's settlement in the United States, the Court concludes that Brianna is not well-settled in the United States. In light of Ms. Brito's failure to prove the well-settled defense, the only time limitation placed upon Mr. Salmeron's petition is that it must be filed before Brianna turns sixteen years of age. *See Convention,* art. 4 ("The Convention shall cease to apply when the child attains the age of 16 years.") Having met this

---

**23.** *See generally* Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics,* Pew Hispanic Center, June 14, 2005 (detailing statistics about the U.S. immigrant population with respect to family status, education, income, and migration patterns).

**24.** *Id.* at 27.

**25.** *Id.* at 35.

requirement, as Brianna is ten years of age, Ms. Brito's challenge to the timeliness of Mr. Salmeron's petition fails.

### 3. Whether Mr. Salmeron Acquiesced to Brianna's Retention

Ms. Brito has raised the affirmative defense that Mr. Salmeron forfeited his custody rights and acquiesced to Brianna's retention in the United States. Article 13a of the Hague Convention allows the reviewing court to deny the child's return if "the person ... having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention ...." *Convention,* art. 13; § 11603(e)(2)(B). Ms. Brito bears the burden of proving this defense by a preponderance of the evidence. § 11603(e)(2)(B).

As Brianna was habitually resident in Mexico immediately prior to her retention, the domestic laws of that nation must be applied in evaluating Mr. Salmeron's behavior. Under Mexican law, a parent's right to custody is governed by the concept *of patria potestas.* *Patria potestas* provides that both mother and father jointly exercise custody over an unemancipated minor. Codigo Civil Para El Estado de Guerro, art. 593 ("Parental authority/responsibility [*patria potestas*] is to be exerted by the father and mother jointly."); Codigo Civil Federal art. 414 ("Parental authority/responsibility [*patria potestas*] is exerted by both parents.") (*cited in* Declaration of Ella R. Serrano in Support of Petition ("Serrano Decl. I"), ¶¶ 4–5, Exhs. C–F, Luis H. Almeida trans.). Mexican law explicitly provides that a parent's rights under *patria potestas* are not waivable. Codigo Civil Para El Estado de Guerro, art. 625 ("Parental authority/responsibility [*patria potestas*] is not waivable ...."); Codigo Civil Federal art. 448 (same) (*cited in* Serrano Decl. I, ¶¶ 4–5, Exhs. C–F, Luis H. Almeida trans.).

In *Friedrich v. Friedrich,* the Sixth Circuit examined the circumstances under which a parent fails to exercise custody rights over the child. 78 F.3d 1060 (6th Cir.1996). The court concluded:

[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.

*Id.* at 1066. Any lesser standard, the court reasoned, would require an evaluation going to the merits of the custody dispute, namely "whether the parents exercised the custody rights well or badly." *Id.* Applying the standard, the court concluded the petitioner did not fail to exercise his custody rights because he retained his son's belongings and made arrangements for visitation. *Id.* The respondent's allegations that the petitioner "expressed a general willingness that [the child] move to America with his mother" was insufficient to establish a failure to exercise custody rights. *Id.*

The facts here establish that Mr. Salmeron did not forfeit his custody rights over Brianna at the time of her retention. Before consenting to her visit to the United States in June 2002, Mr. Salmeron registered Brianna for the upcoming school year in Mexico. When Brianna lived with Ms. Brito in the summer of 2002, Mr. Salmeron spoke to her by telephone two or three times per week. Upon Ms. Brito's refusal to allow Brianna to return to Mexico for the start of the school year, Mr. Salmeron made at least five separate requests that Brianna be returned to Mexico for schooling. These affirmative acts cannot constitute a failure to exercise custody rights. *See Friedrich,* 78 F.3d at 1066. Moreover, Brianna was in Ms. Brito's exclusive physical custody. Simply because

Mr. Salmeron was prevented from exercising physical custody over Brianna does not prove he forfeited all custody rights. *Cf. Giampaolo,* 390 F.Supp.2d at 1279 (noting that physical custody is only one of a "bundle of rights" possessed by a parent under *patria potestas* in Argentina). To the contrary, when given the chance, Mr. Salmeron sought to exercise his custody rights over Brianna with respect to where she lived and how she was educated.

Citing *Gonzalez v. Gutierrez,* 311 F.3d 942 (9th Cir.2002), Ms. Brito argues that Mr. Salmeron relinquished custody rights to Brianna in return for access rights because he stated in his petition that he consented to Brianna living with Ms. Brito and her boyfriend, and asked only that Brianna be allowed to communicate with him and visit on vacations. (*See* Opp'n at 24.) In *Gonzalez,* the Ninth Circuit reversed a district court decision ordering the return of the petitioner's children to Mexico because the petitioner had only access rights to the children, not custody rights. 311 F.3d at 954. *Gonzalez,* however, is factually distinct from the petition here. In *Gonzalez,* a Mexican court entered a custody order granting only access rights to the father. *Id.* The custody order therefore extinguished some rights the father would have otherwise been entitled to under *patria potestas. See id.* Here, there is no similar judicial order denying Mr. Salmeron custody rights. Under Mexican law, Mr. Salmeron cannot waive his custody rights by conduct, or by requesting visitation and telephone communication as Ms. Brito argues. *See* Codigo Civil Para El Estado de Guerro, art. 625; Codigo Civil Federal art. 448 (*cited in* Serrano Decl. I, ¶¶ 4–5, Exhs. C–F, Luis H. Almeida trans.). There is no evidence that Mr. Salmeron did not have the power to specify where Brianna resided in the absence of Ms. Brito's retention. *But see Gonzalez,* 311 F.3d at 949 (finding that a

parent's inability to specify the child's residence indicated access rights, not custody rights). For these reasons, Mr. Salmeron had custody rights, not access rights, regardless of any statements in his petition. His exercise of those rights is entirely consistent with a father whose child is living in a country he may not legally enter. Ms. Brito has not carried her burden of proving that Mr. Salmeron forfeited his custody rights under *patria potestas.*

Ms. Brito's argument that Mr. Salmeron acquiesced to Brianna's retention in the United States also fails. Acquiescence under the Hague Convention requires "either an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich,* 78 F.3d at 1070 (internal citations omitted). Ms. Brito argues that Mr. Salmeron "otherwise consented to Brianna remaining in the United States without him." (Opp'n at 24.) But, as Mr. Salmeron testified at trial, his consent for Brianna to remain in the United States was premised on Ms. Brito's physical custody of Brianna and his inability to enter the United States legally. Under those circumstances, he had no leverage to demand otherwise. In essence, this compromise was forced upon him by the circumstances. This cannot be construed as a "consistent attitude of acquiescence." *Friedrich,* 78 F.3d at 1070; *see also* Linda J. Silberman, *Hague Convention on International Child Abduction: A Brief Overview and Case Law Analysis,* 29 Fam. L.Q. 9, 26 (1994) (cautioning courts against treating negotiations as acquiescence). Nor can the statements in Mr. Salmeron's Hague application be construed as a formal renunciation of rights or a convincing written renunciation of rights.[26] *See Friedrich,* 78 F.3d at 1070. Mr. Salmeron's Hague application is an *ex post* memorialization of what tran-

---

**26.** In his petition, Mr. Salmeron wrote, "I then found out [Ms. Brito] was living with

another man and that she was preagnat [sic],

spired between the parties. His narrative explanation of events does not carry the required degree of formality akin to, for example, testimony at an official judicial proceeding. *See Journe v. Journe,* 911 F.Supp. 43 (D.P.R.1995) (construing a voluntary dismissal of a foreign custody proceeding as a formal renunciation of rights.) In addition, Mr. Salmeron's application is insufficiently definite as to whether Mr. Salmeron agreed to Ms. Brito living with another man, or Brianna living with Ms. Brito and her boyfriend. Given the lack of formality and clarity, Mr. Salmeron's statement in the Hague application cannot be construed as a convincing written renunciation of rights. *See Friedrich,* 78 F.3d at 1070.

To the contrary, Mr. Salmeron's actions in the wake of Brianna's retention are antithetical to a parent acquiescing to his child's retention in a foreign country. Mr. Salmeron first appealed to Grandmother Salmeron, then living in the United States, to contact United States officials for help. When that failed, Mr. Salmeron visited a number of Mexican agencies, both in Acapulco and Mexico City, to have Brianna returned to him. Upon filing his Hague application with the Department of State, Mr. Salmeron made the twelve hour round-trip journey to Mexico City eighteen times in an effort to inquire about the status of his application. On a number of those occasions, he slept outside the doors of the Department of State to ensure he could meet with Mexican officials. By no means can the Court conclude that Mr. Salmeron has demonstrated anything less than a tireless devotion to be reunited with his daughter through legal means. Faced

with a child retained in a foreign country, a complicated and time-consuming legal process, and an inability to enter the United States legally, Mr. Salmeron's actions cannot be faulted, and certainly cannot be construed as acquiescing to Ms. Brito's retention of Brianna in the United States. *See Furnes,* 362 F.3d at 724 (affirming the district court's conclusion that the petitioner's efforts to obtain legal assistance "are completely inconsistent with any claim of acquiescence in the child being detained permanently in the United States").

### 4. Brianna's Views on Whether She Should be Returned to Mexico

The Hague Convention empowers a reviewing court to decline to return the child to the country of habitual residence if the child objects to the return, provided the child has "attained an age and degree of maturity at which it is appropriate to take account of [her] views." *Convention,* art. 13. While the Convention does not offer any guidance as to what age courts should begin to take account of the child's views, courts have credited the testimony of children as young as six years of age for purposes of assessing the child's objection. *See United States v. Thai,* 29 F.3d 785, 810 (2d Cir.1994) (six year old child); *see also Blondin v. Dubois,* 238 F.3d 153, 168 (2d Cir.2001) (eight year old child); *but see England v. England,* 234 F.3d 268, 272 n. 4 (5th Cir.2000) (finding a thirteen year old was not of the appropriate age and maturity to object to her return). As Brianna is now ten years of age, the Court heard in chambers testimony from Brianna to ascertain whether her views should be considered, and if so, what those views are.[27]

when I asked her about it, she did not deny it. She told me that that was the reason why she wanted me to send my daughter without me. We then reached an agreement, I told her that it was alright for her to live with somebody else, but that she had to allowe [sic] me

to communicate with my daughter and lent her to me during vacations, she agreed." (Pet. for Return of Child to Mexico, Exh. 1, pg. 12.)

**27.** Brianna's testimony was taken in chambers based on a stipulation between the par-

In chambers, Brianna expressed her objection to being returned to Mexico and a desire to remain with her mother in the United States. She did, however, state her willingness to have visits with her father in the United States. While Brianna's testimony demonstrated that she is an intelligent and poised ten year old, the Court concludes that it cannot offer definitive weight to her testimony for two reasons. First, Brianna's testimony raises a strong inference that it has been affected, whether intentionally or not, by her mother's influence. Brianna used the word "harassed" to describe Mr. Salmeron's conduct during telephone calls.[28] She also described Ms. Brito's fiancé, Mr. Aguilar, as "lovable."[29] While Brianna may be a precocious child, her choice of vocabulary suggests adult influence. If Brianna's views have been imposed upon her by Ms. Brito's characterization of Mr. Salmeron's behavior, consciously or subconsciously, the Court cannot conclude that she has reached a degree of maturity to allow her to express her individual views free from outside influence. *See In re Robinson*, 983 F.Supp. at 1344 (declining to give weight to the child's testimony because the child testified to the legal conclusion of being "settled," which evidenced "undu[e] influence or pressure[ ] by his counselor and respondent). For that reason, Brianna's testimony is more a reflection of her environment, where the events of this action are undoubtedly discussed, than her own independent opinion about her return.

Second, as described in detail in part 2, *supra*, Brianna has not yet reached the age and maturity to fully comprehend the significant impediments her immigration status will present to her development and future. That a ten year old girl objects to being returned to a country she has not visited in five years, and to a father she has not seen in five years was not an unexpected sentiment. Brianna has undoubtedly developed a strong relationship with her mother and a high level of familiarity with her life in Huntington Beach. In the short term, returning to Mexico is a frightening proposition. A ten year old child cannot be expected to weigh the immediate yet short-term effects of returning to Mexico against the barriers she will face as she matures into adulthood as an illegal alien in the United States. Because the Court finds that Brianna's status as an illegal alien is an important consideration in evaluating Mr. Salmeron's petition, and because Brianna has not demonstrated an ability to grasp these complicated issues, the Court must decide Mr. Salmeron's petition without consideration of Brianna's objection.

## CONCLUSION

For the foregoing reasons, Mr. Salmeron has met his burden of establishing that Brianna was wrongfully retained in the United States in violation of his custody rights under Mexican law. Ms. Brito did not prove any defenses to the petition. Accordingly, Mr. Salmeron's petition is hereby GRANTED. Brianna's custody, the merits of which this Court did not reach, shall be decided by the courts of Mexico pursuant to that country's domestic law.

ties. Mr. Salmeron and Ms. Brito were not present during her testimony. Brianna was questioned by both parties' lawyers as well as the Court.

**28.** The Court: "Do you remember talking to [Mr. Salmeron] on the phone? A: Yeah, but every time he talked to me he always harassed me and he would make me cry." (11/7/07 Tr., 9:13–15.)

**29.** The Court: "And [do] you have any problem with [Mr. Aguilar]? A: No. He is a very loveable person. If I'm having trouble with something, he always sits down with me and listens to me." (*Id.* at 16:12–14.)

Brianna del Carmen Salmeron Miranda shall be RETURNED to Mexico within thirty (30) days of this order for custody proceedings.[30] Ms. Brito may accompany Brianna to Mexico should she so choose. Should Ms. Brito prove unwilling to accompany Brianna to Mexico, Brianna shall be returned with Mr. Salmeron. Brianna shall not be removed from the Central District of California pending her return to Mexico for custody proceedings without permission from the Court. Should Ms. Brito choose to appeal the Court's order, Brianna may remain in Ms. Brito's custody in the United States until and in accordance with any ruling from the Ninth Circuit Court of Appeals.

---

**30.** The Court expects both parties to make every reasonable effort to ensure Brianna's transition is conducted in her best interest, giving due consideration to her educational, emotional and social needs.