**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: B. DEL C. S. B., (minor),

IVAN NEMECIO SALMERON MENDOZA,
          *Petitioner-Appellee,*

v.

GEREMIAS BRITO MIRANDA,
          *Respondent-Appellant.*

No. 08-55067

D.C. No.
CV-07-00290-CJC

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued August 7, 2008
Submitted September 22, 2008
Pasadena, California

Filed March 18, 2009

Before: Stephen Reinhardt, Roger J. Miner,* and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Reinhardt

---

*The Honorable Roger J. Miner, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

## COUNSEL

Mark T. Cramer and Elisa L. Miller, Kirkland & Ellis LLP, for the respondent-appellant.

Lori R.E. Ploeger, Maureen P. Alger, and Christopher B. Durbin, Cooley Godward Kronish LLP, for the petitioner-appellee.

## OPINION

REINHARDT, Circuit Judge:

It is never an easy nor a joyous task to resolve a dispute between parents that may determine the custody of their child; nor is the outcome ever fully satisfactory. Frequently, both sides offer appealing, indeed compelling, arguments. Yet, both cannot prevail. Hague Convention cases are surely no exception to that rule. Nevertheless, we must decide here

whether a child of Mexican origin, whose mother wrongfully retained her in the United States, should be allowed to stay in her current home while custody proceedings are conducted in the United States, or whether she should be returned to Mexico while the proceedings are conducted there.

To decide this issue, we must consider a question of first impression in our circuit: whether a court may find that a child is not "settled" for the purposes of Article 12 of the Hague Convention for the reason that she does not have lawful immigration status. We must also decide whether, in this case, the mother "concealed" the child's whereabouts, so that the father is entitled to equitable tolling of the one-year filing period set forth in Article 12. On both questions, we conclude that the answer is no.

## I. Overview of the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention")

The Hague Convention, to which both the United States and Mexico are parties,[1] was enacted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ." Hague Convention, preamble. "[T]he Convention's drafters were concerned primarily with securing international cooperation regarding the return of children wrongfully taken by a parent from one country to another, often in the hope of obtaining a more favorable custody decision in the second country." *Gonzales v. Gutierrez*, 311 F.3d 942, 944 (9th Cir. 2002); *see also* Hague Convention art. 3 (explaining when the

---

[1]The United States Congress implemented the Convention's provisions in 1988 with the passage of the International Child Abductions Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* Mexico became a party to the Convention in 1991. *See Duarte v. Bardales*, 526 F.3d 563, 568 & n.7 (9th Cir. 2008).

removal or retention of a child is "wrongful").The Convention seeks generally to accomplish its aim by preventing an abducting parent from benefitting from his actions by requiring that a wrongfully removed child be returned to the country of its habitual residence for custody proceedings. *See* Hague Convention art. 12. The Convention explicitly does *not* purport to resolve the merits of any underlying custody disputes. *See* Hague Convention art. 19; *see also Gonzalez*, 311 F.3d at 945. Rather, "[t]he Convention's focus is . . . *whether* a child should be returned to a country for custody proceedings and not *what* the outcome of those proceedings should be." *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004).

Despite the Convention's "desire to guarantee the re-establishment of the *status quo* disturbed by the actions of the abductor," its drafters recognized the need for several important exceptions to the general rule of return. Elisa Perez-Vera, Explanatory Report ¶ 18, 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982) [hereinafter "Perez-Vera Report"].[2] One such exception is the affirmative defense provided in Article 12: If the abducting parent can show that the petition for return was filed more than a year after the wrongful removal or retention occurred, and "that the child is now settled in its new environment," the abducting parent can overcome the presumption in favor of return. Hague Convention art. 12[3]; *see also* 42 U.S.C. § 11603(e)(2)(B); *Duarte*,

---

[2]The "Perez-Vera Report" is "recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of [its] provisions." *Shalit v. Coppe*, 182 F.3d 1124, 1127-28 (9th Cir. 1999) (internal citation omitted).

[3]The other exceptions to the Convention's return mandate are: (1) consent to or acquiescence in the removal or retention by the non-abducting parent, (2) that return poses a grave risk of physical or psychological harm, or would place the child in an intolerable situation, (3) the objection of a child that "has attained an age and degree of maturity at which it is appropriate to take account of its views," and (4) the return would not comport with "the protection of human rights and fundamental freedoms." Hague Convention arts. 13, 20.

526 F.3d at 569. The rationale behind Article 12's "now set-tled" defense is that when "a child has become settled and adjusted in [his new environment, a] forced return might only serve to cause him or her further distress and accentuate the harm caused by the wrongful relocation."). Beaumont & McEleavy, *The Hague Convention on International Child Abduction* 203 (1999); *see also* Perez-Vera Report ¶ 107 (explaining that "it is clear that after a child has become set-tled in its new environment, its return should take place only after an examination of the merits of the custody rights exer-cised over it . . . .").

The Convention does not provide a definition of the term "settled." However, the U.S. State Department has declared that "nothing less than substantial evidence of the child's sig-nificant connections to the new country is intended to suffice to meet the respondent's burden of proof." Public Notice 957, Text & Legal Analysis of Hague International Child Abduc-tion Convention, 51 Fed. Reg. 10494, 10509 (U.S. State Dep't Mar. 26, 1986).

## II. Background

Ivan Nemecio Salmeron Mendoza ("Salmeron") and Geremias Brito Miranda ("Brito") are the unmarried parents of eleven-year-old Brianna. Both parents are Mexican citi-zens; neither has legal status in the United States.[4] Brito was born in Mexico and was brought by her mother ("Grandmother Brito") to the United States in 1981, when she was one or two years old. She has lived the majority of her life in Southern California, where she has a large extended fam-ily.[5] Salmeron lived in the United States between 1988 and 1996.

---

[4]Although Brito does not currently have legal status, her mother, a U.S. citizen, testified that she submitted "papers" to immigration authorities in an effort to help Brito gain such status. If her mother were successful, Brito would be able to file for lawful permanent resident status for Bri-anna.

[5]Brito's mother lives in Garden Grove, her aunt lives in Los Angeles, and several of her brothers and sisters live in Westminster. She also has

Salmeron and Brito met and began dating in Santa Ana, California in 1994. Salmeron was twenty-four years old at the time, and Brito was fourteen. In 1995, the couple moved to Oregon. While living in Oregon, Salmeron was arrested on three separate occasions, including once for driving under the influence, once following a domestic dispute with Brito while she was pregnant with Brianna, and once, in 1996, for drug trafficking. The last arrest led to his deportation to Mexico. In the fall of 1996, Salmeron re-entered the United States without documentation and reunited with Brito. In December 1996, the couple decided to return to Mexico and live with Salmeron's mother ("Grandmother Salmeron") in Acapulco rather than appear at court proceedings related to Salmeron's arrests. Brito was about six months pregnant with Brianna at the time.

On April 17, 1997, Brianna was born in Acapulco, Mexico. The new parents struggled for the next four years to provide for their daughter. They lived at Grandmother Salmeron's home in Acapulco. Salmeron worked long hours; Brito and Grandmother Salmeron stayed home and cared for Brianna.

Both Brito and Salmeron describe their relationship during this time as abusive. Brito claims that Salmeron often came home drunk and beat her, and that Brianna saw and heard this happening. She also claims that he was unfaithful to her, and that she had to bail him out of jail on several occasions because of weapons and drug-related incidents.[6] Salmeron also described mistreatment. He submitted a copy of a local court document recounting Brito's physical and verbal abuse, including an incident in which Brito allegedly attacked him with a knife.

---

a sister in Las Vegas, an older brother in San Francisco, an uncle in Oregon and other family in Washington.

[6]Brito submitted no evidence to support her claims of abuse. In order to counter her claims, Salmeron provided an uncertified letter from the Mexican police stating that he has no criminal record in the country.

In February 2001, Brito decided to move back to the United States. She and Brianna traveled into California illegally by way of the Tijuana border crossing and moved into Grandmother Brito's home in Garden Grove, California. At the time, Salmeron was under the impression that the couple would reunite either in the United States or Mexico. Brito, by contrast, testified that she intended her relocation back to the United States to be permanent, and that she considered her relationship with Salmeron to be over upon her departure from Mexico. Brito did not, however, discuss these sentiments with Salmeron. Both parties testified that they were regularly in contact by telephone and mail after Brito's move, and that Brianna and Salmeron spoke often.

In June 2001, Brito and Salmeron decided that Brianna should return to her father in Mexico. Brito could not yet register Brianna for school because she was only four years old, a year below the minimum age requirement. In addition, Brito had just lost her job and could not afford to care for Brianna. Thus, on June 15, Grandmother Salmeron accompanied Brianna back to Acapulco, where Salmeron enrolled her in a private summer school program and arranged for her to start school that fall. Again, the three were regularly in contact by telephone and mail while Brianna completed a year of preschool.

In August 2001, while Brianna was living with her father, Brito began a romantic relationship with Aiden Aguilar, who subsequently became her fiancé. In December of that year, the two moved into their current Huntington Beach apartment together. Salmeron was made aware of Brito's new address within two months of her move, as evidenced by the DHL packing slip that was affixed to a package he sent to her on February 26, 2002.[7]

---

[7]Although aware of the new address, Salmeron was not aware of Brito's new relationship. Rather, he thought that she was living with a female co-worker.

As Brianna's school year came to an end, Brito and Salmeron agreed that Brianna would travel back to California to stay with her mother. In June 2002, Brianna returned to the United States and moved into Brito's new apartment. Salmeron's understanding was that this was a temporary arrangement, as he had already registered Brianna for the 2002-2003 school year in Mexico. However, Brito claims that Brianna was being sent to her permanently to await Salmeron's arrival in the United States, and that she never had any intention of returning the child to Acapulco.

That August, Brianna mentioned in a telephone conversation with her father that her mother was in a relationship with another man, and that her mother was pregnant. Salmeron testified that he then requested that Brianna be returned to him so that she could start school in September. He testified that he asked Brito to return their daughter to Mexico approximately five different times, but that Brito refused to send her back. Eventually, Salmeron agreed to allow Brianna to stay in the United States on condition that he would be able to speak with her on the telephone and see her during school holidays.

In the fall of 2002, Brianna began kindergarten in Huntington Beach. Salmeron was initially able to maintain contact with her. That communication ended, however, in late 2002 or early 2003. The parties differ in their explanations of the reason this occurred,[8] but neither party disputes that commu-

---

[8]According to Salmeron, Brito cut off their communication because she was frustrated that Brianna would cry that she missed her father. Brito, on the other hand, claims that she was forced to end communications with Salmeron because he made a number of drunken calls in the middle of the night that upset and "traumatized" Brianna. The district court found that the drunken calls most likely occurred in 2001, when Brito was still living with her mother (who, according to Brito, was also upset by the calls). The court therefore found that the calls were "unlikely to have been the actual grounds for Ms. Brito's decision to change her telephone number in 2002." *In re B. del C.S.B.*, 525 F. Supp. 2d 1182, 1187 n.9 (C. D. Cal. 2007).

nication was eventually completely cut off between father and daughter.

Salmeron testified that when he called the numbers he believed to be Brito's after January 2003, he received messages that stated that she could no longer be reached at her home number and that her cell number was out of service. He did not attempt to contact Brito at her work telephone number, which Brito contends he possessed and which remained the same throughout. He did, however, contact Grandmother Brito to try and find a working phone number for Brito and Brianna. Grandmother Brito allegedly informed him that Brito had moved from the Huntington Beach apartment, and that she was forbidden to disclose Brito's new telephone number. Brito admits that she changed her telephone number and told her mother not to provide Salmeron with her new number. However, she denies telling her mother to inform Salmeron that she had moved. Even though Grandmother Salmeron was then living in the area and maintained contact with Grandmother Brito, Salmeron never requested that his mother drive by the Huntington Beach apartment to confirm that Brito had actually moved.

During the more than five years between Salmeron's last contact with Brianna and the present, each party's personal life has progressed in new directions. Brito gave birth to her son, Brianna's half-brother, Brian Aguilar, on March 8, 2003, and has since become engaged to the child's father. She also testified that she has a business in Huntington Beach doing restaurant maintenance, and that her fiancé works as a chef at a local restaurant. Salmeron makes his living driving a taxi in Acapulco, where he and his girlfriend Jasmine have been living together since he left his mother's home in 2003. Salmeron now has a son as well, Brianna's half-brother, to whom Jasmine gave birth in October 2003. Grandmother Salmeron, a U.S. citizen, spends the majority of her time with her other children, in either Riverside, California or Denver, Colorado.

The Acapulco home in which Brianna used to live is currently vacant.

Most important, Brianna's life has developed in significant ways. She has completed the first through fourth grades, and was scheduled to begin the fifth grade at the same school last fall. Brianna's report cards reflect consistently good grades and attendance and demonstrate that she is progressing well both academically and socially. She is bilingual: she can speak, read, and write in both English and Spanish. Her teachers describe Brianna as a child who is "eager to learn." While her favorite subject in school is math, she also "excel[s]" in science and social studies, and her registration records indicate no significant periods of absence. After she finishes her homework and on the weekends, Brianna likes swimming, going to the park to play volleyball, baseball, and basketball with her younger half-brother and his father, Brito's fiancé, and playing soccer with the team of which she is the captain.

Despite all of the changes in the family members' lives, certain significant factors have remained the same. Brito and Brianna have continued to reside in the same Huntington Beach apartment that Brito rented with Aguilar in December 2001. Brianna has been enrolled under her own given name and surname in the same public school for the entire time she has been in the United States.

Since their last telephone conversation in January 2003, Salmeron has consistently attempted to renew his relationship with Brianna. Although he has been unable to speak with his daughter, Salmeron sent gifts and money by way of his mother, who would pass them on to Grandmother Brito for delivery. Salmeron also engaged in legal efforts to re-establish contact, beginning in July 2003, when Grandmother Salmeron visited the Mexican Consulate in Santa Ana, California on his behalf.[9] She was told that Salmeron would have

---

[9]Salmeron testified that he waited approximately six months to begin pursuing potential legal remedies because until that point he still "held out hope" that Brito's relationship with Aguilar would end and that she would decide to send Brianna back to Mexico on her own.

to contact officials in Acapulco for help. A month later, Salmeron visited the Office of Family Integration Services in Acapulco, which then referred him to the Minors Protection Department in Chilpancingo, located about two hours from his home. Salmeron claims that he visited this office on four separate occasions before he was referred to the Department of State for Protection of Minors in Mexico City, a twelve-hour round-trip car ride from Acapulco. Salmeron testified that he traveled between Acapulco and Mexico City approximately eighteen times, and slept outside the State Department building at least once in an effort to determine the whereabouts of his daughter.

During one of his trips to Mexico City, Salmeron secured a meeting with the head of the appropriate section in the State Department, who subsequently gave him an application to begin the Hague petition process, which he completed without the assistance of counsel. He testified that these officials advised him to include Grandmother Brito's Garden Grove address on his application, as he thought that Brito had left the Huntington Beach apartment and he did not have any other address for her. In October 2003, Salmeron submitted the completed application in Spanish, but was informed that he was required to submit it in English as well. He therefore mailed the materials to Grandmother Salmeron in the United States and waited for almost seven months for the return of the translated application and birth certificate.

On March 26, 2004, more than a year after his last contact with Brianna, Salmeron submitted his Hague application to the Mexican Central Authority for processing. The Mexican Central Authority advised him not to take any further action, and to let the "long" Convention process run its course. On April 2, 2004, the Mexican Central Authority transmitted the application to the United States Central Authority. On April 26, 2004, the National Center for Missing and Exploited Children ("NCMEC") received Salmeron's application from the United States Central Authority, and forwarded a copy to the

Office of the Attorney General of California. More than two years later, on July 27, 2006, NCMEC located an address for Brito and Brianna — the same address that Salmeron last had for them — and sometime that following February, Brianna's presence in the Huntington Beach apartment was confirmed by the Orange County District Attorney's office.

On March 9, 2007, more than four years after Salmeron's last telephone contact with Brianna and approximately one month after he was advised by the authorities of her location in the United States, Salmeron filed his Hague petition in the United States District Court for the Central District of California. Brito opposed the petition on three grounds: (1) Brianna could not have been wrongfully retained because the United States was her habitual residence, (2) Salmeron forfeited his custody rights by acquiescing to Brito's desire to keep Brianna in California, and (3) Salmeron's petition was filed more than one year after the alleged wrongful retention and Brianna had since become settled in her new environment. An evidentiary hearing was held on November 6 and 7, 2007. Salmeron, Brito, Brianna, Grandmother Salmeron, and Grandmother Brito all testified.

On December 3, 2007, the district court granted Salmeron's petition. Specifically, the court found that Brito's retention of Brianna had become "wrongful" retention under the terms of the Convention "sometime between Ms. Brito's disclosure of her new romantic relationship in August 2002 and Mr. Salmeron's last conversation with Brianna in January 2003[,]" that Brianna's country of habitual residence prior to the wrongful retention was Mexico, and that Salmeron did not acquiesce in Brianna's retention. *In re B. del C.S.B.*, 525 F. Supp. 2d at 1190-93. Further, the court held that Brito did not satisfy her burden of proving an Article 12 defense because Brianna's unlawful immigration status precluded her from being settled in the United States. *Id.* at 1194-95. The district court ordered Brianna returned to Mexico for custody proceedings within thirty days.

Because the district court found that Brianna was not settled in the United States, it did not reach the parties' arguments with respect to the timeliness of Salmeron's petition and the availability of equitable tolling, which would have been relevant to defeating Brito's Article 12 defense.[10] However, the district court did note that it found credible Salmeron's testimony with respect to Brito's concealment of Brianna and his efforts to locate her. *Id.* at 1194 n.22. Under these facts, the court added that even if Brito had shown that Brianna was well settled in the United States, it would be "entirely reasonable" to toll the one year filing period until early 2007, when Brianna was located, and so to grant Salmeron's petition and order Brianna returned to Mexico for custody proceedings. *Id.*[11]

---

[10] As the district court noted, a petition "under the Hague Convention is not subject to a traditional statute of limitations period." *Id.* at 1193. Under Article 12, if "a period of less than one year has elapsed" between the date of the wrongful retention and the initiation of judicial proceedings, the district court presumes that the child should be returned to its country of habitual residence. Hague Convention art. 12. If a year or more has passed, however, the parent who wrongfully retained the child may raise an Article 12 defense by "demonstrat[ing] that the child is now settled in its new environment" and so should not be removed. *Id.*; *see also* 42 U.S.C. § 11603(e)(2)(B); *Duarte*, 526 F.3d at 569 ("[T]he 'well settled' affirmative defense is only available if the petition for return was filed more than a year from wrongful removal."). So, in this case, the length of time that passed between Brito's wrongful retention and the filing of Salmeron's petition with the district court is relevant to determining whether Brito may raise an Article 12 defense against the presumption of return.

[11] In reaching his decision, the district judge refused to rely on Brianna's preference to remain with her mother in the United States, as he was empowered to do under Article 13 of the Hague Convention. *Id.* at 1198-99. The court noted that the child, who was ten at the time, appeared to have been influenced by her mother's description of events, because she used words such as "harassed" and "lovable." *Id.* On this basis, the court found that Brianna had not yet reached an age and degree of maturity such that her preference should be taken into account. *Id.* Because we need not consider Brianna's preference in order to reach the conclusion we do, it is not necessary for us to review the district court's finding. Our failure to do so does not, however, indicate agreement with the view that a child of Brianna's age who uses the words in question is necessarily influenced by a parent.

Brito filed her timely Notice of Appeal on December 28, 2007, challenging only the district court's denial of her Article 12 defense. She contends that the district judge erred in finding that Brianna was not settled in the United States solely because she does not have legal status and that Salmeron is not entitled to equitable tolling with respect to the filing of his petition.

### III.    Standard of Review

We must decide as a matter of first impression the proper standard of review to be applied to (1) a district court's conclusion that a child is not "now settled" within the meaning of Article 12 and (2) a district court's determination that equitable tolling may be applied to the one-year filing period provided in Article 12. We conclude that we must review the district court's factual determinations for clear error, and its application of the treaty to those facts de novo.

In an analogous context, we have consistently held that a determination of "habitual residence" under Article 3 of the Hague Convention is "a mixed question of law and fact, under which we review 'essentially factual' questions for clear error and the ultimate issue of habitual residence de novo." *Holder*, 392 F.3d at 1015 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1073 (9th Cir. 2001)); *see also Papakosmas v. Papakosmas*, 483 F.3d 617, 623 (9th Cir. 2007).[12] We arrived at this standard of review by recognizing that "[d]espite the factual focus of our inquiry, ultimately our conclusion rests on a legal determination: After scrutinizing the circumstances of a particular case, we must determine whether the discrete facts add

---

[12]Article 3 of the Hague Convention provides that a removal is wrongful only where a child is removed in violation of the "law of the State in which the child was *habitually resident* immediately before the removal or retention." Hague Convention art. 3 (emphasis added). The term "habitual residence," like the term "settled," was left undefined by the Convention's drafters. *Mozes*, 239 F.3d at 1071.

up to a showing of habitual residence." *Holder*, 392 F.3d at 1015. Similarly, a conclusion as to whether a child is "settled" in her new environment, though fact-specific, ultimately rests on a legal determination of "whether the discrete facts add up to a showing" that she is "settled" within the meaning of Article 12. *See id.*; *see also Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001) (reviewing de novo Article 13(b) defense that a child will face grave risk of harm if returned because "[t]he District Court's *application* of the Convention to the facts it has found, like the *interpretation* of the Convention, is subject to de novo review"). Thus, we review the district court's factual findings underpinning its Article 12 determination for clear error, and its ultimate conclusion that Brianna is not now settled in the United States de novo.

We review the district court's determination that it would equitably toll the one-year filing provision set forth in Article 12 under the same standard.[13] Although we generally review a district court's decision whether to apply equitable tolling in cases where the facts are disputed for abuse of discretion, *see, e.g.*, *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000), the application of this doctrine in the context of an international treaty counsels in favor of applying a de novo standard here. *See, e.g.*, *Cree v. Flores*, 157 F.3d 762, 768 (9th Cir. 1998) ("We review de novo the interpretation *and* application of treaty language.") (emphasis added); *see also Mozes*, 239 F.3d at 1071 (emphasizing " 'the need for uniform

---

[13]Although the district court concluded that it did not need to decide the question of the timeliness of Salmeron's petition because it found that Brianna was not "now settled," it nevertheless made factual and credibility determinations with respect to this question, and strongly suggested that it would have equitably tolled the filing period if it were required to decide the issue. *In re B. del C.S.B.*, 525 F. Supp. 2d at 1194 n.22. We agree with the parties that we may and indeed should address the merits of Salmeron's equitable tolling argument. *See Mozes*, 239 F.3d at 1084 ("Given the need to resolve these regrettably prolonged proceedings as expeditiously as possible, judicial economy counsels that we address certain issues the district court may confront on remand.").

international interpretation of the Convention' " (quoting 42 U.S.C. § 11601(b)(3)(B))). We recently held that equitable tolling is available under the Hague Convention only where "the abducting parent took steps to conceal the whereabouts of the child from the parent seeking return and such concealment delayed the filing of the petition for return." *Duarte*, 526 F.3d at 570. The need for uniform interpretation of what constitutes "concealment" for purposes of Article 12 tolling weighs in favor of reviewing the factual determinations underlying the district court's decision to equitably toll for clear error, *see, e.g.*, *Furnes v. Reeves*, 362 F.3d 702, 724 (11th Cir. 2004), and its ultimate conclusion that those facts constitute concealment and thereby warrant equitable tolling, de novo.

## IV. Discussion

### A. The "settled" inquiry

[1] In determining whether a child is settled within the meaning of Article 12, we consider a number of factors that bear on whether the child has "significant connections to the new country." 51 Fed. Reg. at 10509. These factors include: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability. In some circumstances, we will also consider the immigration status of the child and the respondent. In general, this consideration will be relevant only if there is an immediate, concrete threat of deportation. Although all of these factors, when applicable, may be considered in the "settled" analysis, ordinarily the

most important is the length and stability of the child's residence in the new environment.[14]

Applying the factors set forth by the *Duarte* dissent, the district court in the present case found that "Brianna has developed significant connections to the United States." *In re B. del C.S.B.*, 525 F. Supp. 2d at 1194. She has lived in the same apartment and regularly attended school for the past five years, has "achieved academic and interpersonal success at every grade level," is active in extra-curricular activities, has many friends, and regularly visits with her mother's family. *Id.* at 1194-95. The district court nevertheless concluded that Brianna is not "settled" in the United States, because neither she nor her mother is a legal resident of this country. *Id.* at 1195.[15] This conclusion is erroneous. Brianna's current immigration status — a status similar to that of many millions of undocumented immigrants — cannot undermine all of the other considerations which uniformly support a finding that

---

[14]Judge Bea's dissent in *Duarte* is the only time that any member of this court has previously considered whether a child is "settled" in his new environment within the meaning of Article 12. The *Duarte* majority remanded the case for a determination on the equitable tolling question and never reached the "settled" analysis. *See Duarte*, 526 F.3d at 563-71. Judge Bea's dissent includes a list of factors he suggests be considered. In establishing our list of factors, we have in the main adopted those set forth by Judge Bea. *See id.* at 576 (Bea, J., dissenting). We have, however, modified or revised a few of them.

[15]Salmeron argues that the district court did not adopt a *per se* rule that an undocumented immigrant cannot become settled. He contends that the district court's reasoning allows for a contrary result if a child has no remaining ties to his home country or demonstrates that he will imminently be granted legal status. The district court's categorical language belies this argument: "The threat of deportation is not simply an isolated factor . . . . it is a constant danger to Brianna's well-being, threatening to undermine each and every connection to her community that she has developed in the past five years." *In re B. del C.S.B.*, 525 F. Supp. 2d at 1195. As we explain *infra*, even were we to read the district court's ruling as Salmeron does, we would still conclude that the court afforded improper weight to Brianna's immigration status.

she is "settled" in the United States. Indeed, only in a case in which there is an immediate, concrete threat of removal can immigration status constitute a significant factor with respect to the question whether a child is "settled."

**[2]** We can see nothing in the Convention itself, in our case law, or in the practical reality of living in this country without documented status, to persuade us that immigration status should ordinarily play a significant, let alone dispositive, role in the "settled" inquiry. We first consider the text and history of the Convention. *See Gonzalez*, 311 F.3d at 948 (explaining that in interpreting a treaty the court "begin[s] with the text," and then looks beyond to "the purposes of the treaty, its drafting history, and its post-ratification understanding") (internal quotation marks and citations omitted). Neither text nor history suggests that lawful immigration status is a prerequisite, or even a factor of great significance, for a finding that a child is "settled" in a new environment.

**[3]** The text of Article 12 does not define the term "settled," nor "does [it] state how th[e] fact [that a child is now settled in its new environment] is to be proved . . . ." Perez-Vera Report ¶ 109. Article 12's use of a relatively broad, undefined term is consistent with the Convention drafters' desire to avoid "linking the determination of which country should exercise jurisdiction over a custody dispute to . . . idiosyncratic legal definitions . . . ." *Mozes*, 239 F.3d at 1071. Where the Convention fails to define a word or phrase, courts interpret the term according to its "ordinary and natural meaning" rather than a rigid technical or legal definition. *Id.* (internal quotation marks and citation omitted). Applying this method, we have held that unlawful immigration status does not preclude a finding that a child is a "habitual resident" of a country within the meaning of Article 3. *See id.* at 1082 n.45 ("While an unlawful or precarious immigration status does not preclude one from becoming a habitual resident under the Convention, it prevents one from doing so rapidly." (citing E.M. Clive, *The Concept of Habitual Residence*, 1997 Jurid.

Rev. 137, 147)). As Clive explains, "If . . . unlawful or precarious residence continue[s] for long enough the ordinary user of language would no doubt conclude that it ha[s] developed into habitual residence." 1997 Jurid. Rev. at 147; *see also Plyler v. Doe*, 457 U.S. 202, 227 n.22 (1982) (explaining that "illegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a State").

**[4]** We apply the same reasoning in construing the term "settled" in Article 12. As with habitual residence, if a child has been living in a new country for a long enough period of time, an ordinary person could conclude that the child is "now settled" in that country, regardless of his immigration status.[16] Moreover, it would be an odd result indeed if a child may be habitually resident, but not settled, in a country in which he does not have legal status. *See, e.g.*, Beaumont & McEleavy, *supra*, at 207 (arguing that "it would be manifestly unreasonable, if not illogical, to demand a demonstrably higher standard [for settlement] than would, for example, be required to indicate a change in habitual residence"). In applying both terms, we must consider "the child's relative attachments" to the country, *Mozes*, 239 F.3d at 1081, and determine whether those attachments require that the child remain in the new environment or be returned to the prior one. By acknowledging that an undocumented child may be habitually resident within the meaning of Article 3, then, we have already accepted the principle that a child may remain in a place in which he lacks legal status for the duration of custody proceedings because of his close ties to that country. For these reasons, there is no justification in the Convention's text or its subsequent interpretation for holding that a child is not "settled" within the meaning of Article 12 simply because he is not lawfully present in the new country.

---

[16]For example, an undocumented child that arrives as an infant and knows no other home is plainly "settled" in this country under any ordinary understanding of that term.

**[5]** Our second step, after considering the Convention's text and history, is to turn to case law. Here, too, we find no support for the view that immigration status can significantly undermine a finding that a child is "settled" in his new environment. Rather, prior district court cases that have concluded that an undocumented child is not "settled" have considered status as only one element among many pointing to a lack of significant ties to the United States.[17]

**[6]** Although the parties did not cite, and we were unable to locate, an American authority in which the court considered whether immigration status could serve as the sole basis for holding that a child was not "settled," there is an English case on point. *See Furnes*, 362 F.3d at 717 (quoting *Air France v. Saks*, 470 U.S. 392, 404 (1985)) (explaining that in interpreting international treaties, "the opinions of our sister signatories [are] entitled to considerable weight"). In the case of "A Child," England's High Court of Justice Family Division considered whether "A" was settled within the meaning of Article

---

[17] *See, e.g.*, *Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1260 (M.D. Fla. 2008) (finding children not settled where they moved around "quite a bit" and had been at their current residence less than a year, left behind close relationships with family in Mexico, and did not have legal status); *In re Ahumada Cabrera*, 323 F. Supp. 2d 1303, 1314 (S.D. Fla. 2004) (finding child not settled where she changed schools once and residences five times in the two and a half years she resided in the country, had no extended support network in the United States, and both she and her mother did not have legal status); *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1281-83 (N.D. Ga. 2004) (finding child not settled where she lived in at least three different residences and attended three different schools in her two and half years in the United States, had no family with whom she was in contact in the United States, and her mother did not have legal status); *In re Koc*, 181 F. Supp. 2d 136, 152-55 (E.D.N.Y. 2001) (finding child not settled where she moved three times and attended three schools in the two and half years she resided in the country, made no close friends in the United States, and both she and her mother did not have legal status). *But see In re Hague Child Abduction Application*, 2008 WL 913325, at *11 (D. Kan. 2008) (relying on the district court's opinion in the present case to find child not settled within the meaning of Article 12 because she and her mother lacked legal status).

12. A Child [2006] EWHC (Fam) 1229, 2006 2 F.L.R. 797, 2006 WL 1518692, ¶¶ 54-57. "A" and her mother, both United States citizens, had been living in England for five years at the time that the father's Hague petition was filed. *Id.* at ¶ 54. For the duration of that time, the mother and child lived in the same residence. *Id.* The court found that "A" and her mother had integrated into "a small community of supportive friends and relatives by marriage" and that the child "is now happy and making progress at her most recent school." *Id.* at ¶¶ 54-55. The only countervailing factor was that "A" and her mother did not have legal immigration status and that they were therefore "subject in principle to a threat of deportation." *Id.* at ¶¶ 56. The court concluded that despite the mother and child's illegal status, "A" was "settled" within the meaning of Article 12. *Id.* at ¶ 57. We conclude that, as in "A's" case, a child such as Brianna who has five years of stable residence in the United States, coupled with academic and interpersonal success here, may be "settled" within the meaning of Article 12, despite her unlawful status.

**[7]** Third, we conclude that, on a practical level, it makes little sense to permit immigration status to serve as a determinative factor in the Article 12 "settled" analysis. Although there are undoubtedly real risks posed by illegal status, the reality is that millions of undocumented immigrants are presently living in the United States, many of whom will remain here permanently without ever having any contact with immigration authorities. The "[Department of Homeland Security] estimates that the unauthorized immigrant population in the United States numbered 11.6 million in January 2008." Michael Hoeffer, et al., Office of Immigration Statistics, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2008, 1 (2009), http://www.dhs.gov/xlibrary/assets/statistics/~publications/ois_ill_pe_2008.pdf. The majority of these undocumented immigrants are long-term residents: sixty-three percent came to this country before the year 2000. *Id.* at 3. "Millions of immigrants, without regard to immigration status, have regu-

lar employment and established homes in the United States," and "[e]ven with occasional spikes in the enforcement of immigration laws, most unauthorized immigrants are unlikely to face removal." David B. Thornson, *Custody and Contradictions: Exploring Immigration Law as Federal Family Law in the Context of Child Custody*, 59 Hastings L.J. 453, 470-71 (2008). In particular, the likelihood of deportation of law-abiding aliens — such as Brito and Brianna — is small, both because of the sheer number of undocumented immigrants and because the government has set a priority to deport those with criminal records. *See, e.g.*, U.S. Immigration and Customs Enforcement, Secure Communities: A Comprehensive Plan to Identify and Remove Criminal Aliens (2008), http://www.ice.gov/pi/news/factsheets/secure_communit ies.htm. In the ordinary case, then, a child such as Brianna is at minimal risk of removal, as is her mother. As the Supreme Court has recognized,

> [t]o be sure, like all persons who have entered the United States unlawfully, [undocumented] children are subject to deportation. But there is no assurance that a child subject to deportation will ever be deported. An illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen. In light of the discretionary federal power to grant relief from deportation, a State cannot realistically determine that any particular undocumented child will in fact be deported until after deportation proceedings have been completed. It would of course be most difficult for the State to justify a denial of education to a child enjoying an inchoate federal permission to remain.

*Plyler*, 457 U.S. at 226.

Indeed, undocumented immigrants, and undocumented children in particular, benefit from significant protections under state and federal law. *See, e.g.*, *League of United Latin*

*American Citizens v. Wilson*, 997 F. Supp. 1244, 1255-56 (C. D. Cal. 1997) (holding that state cannot deny public education to children based on immigrant status); Cal. Educ. Code § 68130.5(a)(4) (West 2002) (permitting undocumented immigrants to pay in-state tuition fees at California universities and community colleges)[18]; Tanya Broder, Overview of Immigrant Eligibility for Federal Programs 4.3 (October 2007), *available at* http://www.nilc.org/immspbs/special/pb_issues_overview_2007-10.pdf (listing available services as including emergency Medicaid, school breakfast and lunch programs, and access to the Special Supplemental Nutrition Program for Women Infants and Children).

**[8]** The district court's discussion appears to acknowledge implicitly that, to the extent that Brianna's unlawful status poses real risks, such risks are most likely to be suffered (if at all) in the indefinite future. *See In re B. del C.S.B.*, 525 F. Supp. 2d at 1195 (discussing "the limitations [Brianna's] immigration status will place upon her as she matures into adulthood" including lack of driver's license, restricted access to financial aid for college, poor employment prospects, and the threat of deportation). The Convention, however, is concerned with the *present*, and not with determining the best interests of the child in the long term. *See* Hague Convention art. 12 (providing affirmative defense where a child is "*now* settled in its new environment") (emphasis added); *Matovski v. Matovski*, 2007 WL 2600862, at *8 (S.D.N.Y. 2007) (noting that Article 12 is "not an invitation for courts to decide . . . which country offers a more comfortable material existence"). The determination of future well-being is left to the court conducting custody proceedings. A petition brought under the

---

[18]A recent California Court of Appeal decision held that section 68130.5 is preempted by 8 U.S.C. § 1621. *Martinez v. Regents of University of California*, 83 Cal. Rptr. 3d 518, 545 (Cal. App. 3 Dist., 2008). However, the California Supreme Court has granted a petition for review of that decision. *Martinez v. Regents of University of California*, 198 P.3d 1 (Cal. 2008).

Hague Convention, as discussed previously, merely seeks to establish in which country that custody proceeding may take place. Where, as here, a child has lived and thrived in her home and school for over half of her life, and there is no reason to believe that she (or her undocumented parent) will suffer any imminent, negative consequences as a result of her unlawful status, it would be contrary to the Convention's purpose of keeping a child in "the family and social environment in which its life has developed" to rely on immigration status as the basis for rejecting an Article 12 defense. *See* Perez-Vera Report ¶ 11. *Cf. id.* (explaining the Convention's focus on sociological, rather than legal, arrangements in the context of custody rights: "the type of legal title which underlies the exercise of [such] rights over the child matters little, since whether or not a decision on custody exists in no way alters the sociological realities of the problem").

**[9]** Thus, the district court erred in finding that Brianna and her mother's undocumented status "undermine[s] each and every connection to her community that she has developed in the past five years." *In re B. del C.S.B.*, 525 F. Supp. 2d at 1195. Immigration status cannot be determinative for purposes of the "settled" inquiry if, as here, there is no imminent threat of removal. We agree with the district court that but for the immigration question, Brito has demonstrated that "Brianna has developed significant connections to the United States," including a stable home and school life in which she has consistently "achieved academic and interpersonal success" in her five years here. *Id.* at 1194-95. We conclude that, given these circumstances, Brianna is "now settled" in the United States within the meaning of Article 12.

## B.	Equitable tolling

We turn next to the merits of Salmeron's argument that he is entitled to equitable tolling of the one-year period for the filing of his Hague petition and that the Article 12 defense is therefore inapplicable.

**[10]** Article 12 requires the return of a child, whether or not he is "settled," if the non-abducting parent files his Hague petition within one year of the child's wrongful removal or retention. *See* Hague Convention art. 12. We recently held that "equitable principles may be applied to toll the one-year period when circumstances suggest that the abducting parent took steps to conceal the whereabouts of the child from the parent seeking return *and* such concealment delayed the filing of the petition for return." *Duarte*, 526 F.3d at 570 (emphasis added). Relying on this holding, Salmeron contends that, even if we find Brianna to be "settled," we should nevertheless order her returned because Brito concealed Brianna and because Salmeron filed his petition within one year of learning of her location. We reject this argument.

In concluding that equitable tolling is permitted under the Convention, the *Duarte* court reasoned that "[l]ogic and equity dictate that awarding an abducting parent an affirmative defense if that parent hides the child from the parent seeking return would not only encourage child abductions, but also encourage hiding the child from the parent seeking return." *Duarte*, 526 F.3d at 570. *Duarte* recognized, however, the "serious concerns" with its position. *Id.* As one district court explained, "the evident import of [Article 12's one-year period] is not so much to provide a potential plaintiff with a reasonable time to assert any claims, as a statute of limitations does, but rather to put some limit on the uprooting of a settled child." *Toren v. Toren*, 26 F. Supp. 2d 240, 244 (D. Mass. 1998), *opinion vacated on other grounds by Toren v. Toren*, 191 F.3d 23 (1st Cir. 1999); *see also* Perez-Vera Report ¶ 107. Given that equitable tolling may permit the return of children otherwise settled in their new environment, we adhere closely to the parameters set by *Duarte* so as to ensure that the Convention's concern over uprooting children is not sacrificed to its aim of deterring child abductions.

**[11]** Under *Duarte*, a court may equitably toll the one-year period where two related conditions are met: (1) the abducting

parent concealed the child and (2) that concealment caused the petitioning parent's filing delay. *Duarte*, 526 F.3d at 570. Under traditional principles, the party who seeks equitable tolling bears the burden of proving the necessary conditions. *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Here, Salmeron has failed to carry his burden of establishing concealment. There is no evidence that Brito ever hid Brianna's location from Salmeron. To the contrary, the record is clear that Salmeron knew of and sent a package to the Huntington Beach address at which Brianna lived prior to the time that communication was cut off, and that the address did not subsequently change. *Compare Furnes*, 362 F.3d at 708 (finding concealment where petitioner did not at first know whether his child was in Norway or the United States); *Giampaolo*, 390 F. Supp. 2d at 1281 (finding concealment where petitioner knew only that the child was in the United States but "did not know the street address, city, or state where the Child was living for over a year" after removal). Although Salmeron claims, and the district court found, that he was told that Brito and Brianna no longer lived at the Huntington Beach address, there is no evidence that Brito ever told him that they had moved nor that she instructed her mother to do so.[19] Even accepting that Grandmother Brito misrepresented their whereabouts, it would be improper to impute those misrepresentations to Brito in the absence of any evidence that she instructed her mother to lie about Brianna's location. Additionally, Brianna has lived in the same home, at the same address with which Salmeron was familiar, during the entire duration of her alleged concealment. *Compare In re Ahumada Cabrera*, 323 F. Supp. 2d at 1313 (finding concealment where respondent "frequent[ly]" moved residences); *Belay v. Getachew*, 272 F. Supp. 2d 553, 564 (D. Md. 2003) (finding concealment where Petitioner had "[no] information about the

---

[19]The district court found only that Brito instructed her mother not to disclose her new telephone number; it did not find that she told her mother to represent that her address had changed. *In re B. del C.S.B.*, 525 F. Supp. 2d at 1194 n.22.

whereabouts of the child, above and beyond the city listed on the plane ticket" and where Respondent removed the child from the state when learning her father would be in the area). For the entire period of the alleged concealment, Brianna was enrolled under her given name at the same public elementary school in the same school district that she attended prior to the last communication between father and daughter in January 2003. *See, e.g.*, *Duarte*, 526 F.3d at 571-72 (Bea, J., dissenting) (noting in support of the conclusion that father did not conceal children that they remained in same public school which they had always attended). Brianna lived the life of a normal child, regularly playing sports with her friends and family in the public parks. She in no way lived a reclusive existence or avoided public places or exposure. On the basis of this evidence, we must conclude that Salmeron failed to carry his burden of proving that Brito concealed Brianna. He is therefore not entitled to equitable tolling.[20]

## V. Conclusion

For the reasons set forth above, the Article 12 defense applies. Brito met her burden of establishing that Brianna is "now settled" in the United States, and Salmeron failed to establish that he is entitled to equitable tolling.

We decline to remand the case to the District Court for a discretionary determination under Article 18 as to whether Brianna should be returned to Mexico.[21] As Salmeron asserts,

---

[20]Because we find that there was no concealment, we do not consider the second prong of the test for equitable tolling: whether concealment was the cause of Salmeron's delay in filing. We add, however, that we believe Salmeron acted in good faith throughout these many years of separation from his child, and we hope that some arrangement will be arrived at, regardless of any custody award, that will enable both parents to see and visit with their child on a reasonable number of occasions.

[21]*See* Hague Convention art. 18 ("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time.").

the existing record contains sufficient factual findings to support a decision by this court without remand; and *Mozes* counsels us to address whatever issues we may dispose of, "[g]iven the need to resolve these regrettably prolonged proceedings as expeditiously as possible . . . ." *Mozes*, 239 F.3d at 1084. Where, as here, the child at issue is settled in her new environment and has been so for years; and where, as here, there was no showing of "concealment" such that the reprehensibility of the abducting parent's conduct should trump the finding that the child is "settled," we can see no reason justifying an exercise of discretion under Article 18 to order Brianna's return to Mexico.

We emphasize once more that under the Hague Convention, our decision has a limited purpose and effect: it authorizes the initiation of custody proceedings in the United States, and it establishes that Brianna will remain where she is already living throughout the duration of those proceedings. The final determination of where Brianna will live in the future, and in whose custody, will be resolved through those proceedings, and not through this one. In California, as in most states, that determination will be made by giving the foremost consideration to Brianna's best interests. Cal. Fam. Code § 3011.

**[12]** We therefore REVERSE the district court's decision and DENY Salmeron's petition under the Hague Convention.